[Cite as *In re S.M.*, 2011-Ohio-6710.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN RE: S.M., C.M. and D.M.            :

                                       :         C.A. CASE NO. 24539

                                       :         T.C. NO.    2009-5910
                                                             2009-5911
                                       :                     2009-5912

                                       :         (Civil appeal from Common
                                                 Pleas    Court,    Juvenile
Division)
                                       :

                                       :

                        . . . . . . . . . .

                        **O P I N I O N**

          Rendered on the ___23rd___ day of ___December___, 2011.

                        . . . . . . . . . .

CARLEY J. INGRAM, Atty. Reg. No. 0020084, Assistant Prosecuting Attorney, 301
W. Third Street, 5th Floor, Dayton, Ohio 45422
          Attorney for Plaintiff-Appellee

BRADLEY BALDWIN, Atty. Reg. No. 0070186, 854 E. Franklin Street, Dayton, Ohio
45459
          Attorney for Plaintiff-Appellee

ADRIAN KING, Atty. Reg. No. 0081882, 36 N. Detroit Street, Suite 104, Xenia, Ohio
45385
          Attorney for Defendant-Appellant

JEFFREY LIVINGSTON, Atty. Reg. No. 0062466, 120 W. Second Street, Suite 2000, Dayton, Ohio 45402
    Guardian Ad Litem

SAM MOSER, 5700 Mallard Drive, Dayton, Ohio 45424
    Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1} Sam Moser ("Moser") appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which found that one of his children, S.M., was dependent and neglected and that his other children, C.M. and D.M., were dependent, and which granted temporary custody of the children to their mother, Donabel Moser.

{¶ 2} Moser's attorney filed a brief pursuant to *Anders v. California* (1967), 386 U.S. 738, 87 S.Ct.1396, 18 L.Ed.2d 493, stating that after a thorough review of the record, no meritorious issues for appellate review were found. Moser was informed of his counsel's brief, and he was granted time to file a pro se brief, if he chose to do so. No pro se brief has been filed. The case is now before us for our independent review of the record. *Penson v. Ohio* (1988), 488 U.S. 75, 109 S.Ct. 346, 102 L.Ed.2d 300.

{¶ 3} If a child is adjudicated an abused, neglected, or dependent child, the court may commit the child to the temporary custody of a public children services agency, a private child placing agency, either parent, a relative residing within or outside the state, or a probation officer for placement in a certified foster home, or in any other home approved by the court. R.C. 2151.353(A)(2). "In choosing among

the alternatives, the best interest of the child is the court's primary consideration."
*In re L.C.,* Clark App. No. 2010 CA 90, 2011-Ohio-2066, ¶13.

{¶ 4} A court's award of temporary custody must be supported by a preponderance of the evidence. *In re Willmann* (1986), 24 Ohio App.3d 191, 198.[1] A trial court has substantial discretion in weighing the considerations involved in making the determination regarding a child's best interest, and the court's determination will not be reversed absent an abuse of that discretion. *In re K.H.,* Clark App. No.2009-CA-80, 2010-Ohio-1609, ¶66. A trial court abuses its discretion when its decision is "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

{¶ 5} An order of temporary custody that emanates from an adjudication of dependency, neglect, or abuse is final and appealable under R.C. 2501.02 and R.C. 2505.02. *In re Murray* (1990), 52 Ohio St.3d 155.

{¶ 6} In June 2009, Montgomery County Children Services ("MCCS") filed a neglect and dependency complaint with respect to S.M., age 6, and a dependency complaint with respect to C.M., age 5. Two months later, MCCS filed a dependency complaint with respect to D.M, age 10 months. Moser is the father of S.M., C.M., and D.M. The complaint of dependency and neglect of S.M. arose from MCCS's discovery that S.M.'s teeth were "severely deteriorated" and required significant, immediate treatment; the complaints related to C.M. and D.M. were

---

[1] A higher standard of proof, clear and convincing evidence, is required when permanent custody is at issue, because permanent custody is "such a drastic remedy" and involves the termination of parental rights. *In re A.W.,* Montgomery App. No. 21309, 2006-Ohio-2103, ¶6.

based on the allegation that their sibling had not been receiving proper care. A guardian ad litem was appointed for the children.

{¶ 7} After a two-day hearing, the magistrate found the children to be neglected and/or dependent, awarded temporary custody to their mother, and ordered that Moser's contact with the children be limited and supervised. Moser filed objections to the magistrate's decision, pro se, shortly after the decision was issued, but before the transcript was filed; he did not supplement these objections after the transcript was filed. The trial court overruled Moser's objections and adopted the decision of the magistrate.

{¶ 8} Moser appeals from the trial court's decision awarding temporary custody of the children to their mother.

{¶ 9} At a hearing in July 2009, MCCS presented the following evidence:

{¶ 10} MCCS caseworker Caitlyn Royster testified that she became involved in the case when MCCS became aware that Moser was not getting dental care for S.M., who had serious problems with his teeth. Although Moser had visited some dentists with the child, "he would start talking about aliens and Freemasons, and the Medical Society being against him. And *** he would become aggressive, and the providers would say he couldn't come back, they did not want the child to come back."

{¶ 11} In the course of dealing with him about dental care, Royster also became concerned that Moser's mental health posed a risk to the children. Moser talked about preparing a spaceship to leave the planet, about S.M. being the Son of God, and about giving S.M. back to God, with the help of C.M. and D.M. He also

expressed concern that, during the recommended dental surgery, the doctors were going to perform a vasectomy on S.M.; Moser wanted to be present in the operating room to be sure no vasectomy was performed.

{¶ 12} Moser also insisted on the use of Novocain rather than Lidocaine, the medication currently preferred by dentists. Royston attempted to help him find a dentist who would use Novocain but, according to Royston, "[n]obody in Ohio or in the United States *** uses Novocain" anymore. After consulting several dentists (with whom Moser was dissatisfied), Royston helped to arrange for surgery at Children's Medical Center. Moser agreed to let S.M.'s mother take the child for the surgery, but then he came to the hospital himself and challenged the anesthesiologist's plan for medicating S.M. However, with the intervention of MCCS, the surgery was performed on the scheduled date.

{¶ 13} Royston noted that Moser had been treated previously for mental health concerns, but that he believed "that psychologists only write down everything you say and use it against you, and that he wasn't going to incriminate himself."

{¶ 14} Some of the dentists with whom Moser consulted about S.M. also testified on behalf of the State. Dr. Robert Muster saw and treated S.M. in January 2009 for "rampant severe decay." He testified that S.M. presented with three draining abscesses and fifteen cavities. Muster pulled some of S.M.'s front baby teeth without anesthetic and talked about a treatment plan with Moser. During this discussion, Moser refused to consider the use of Lidocaine, the most common local anesthetic, in any of the procedures, because he associated it with evil or the devil. After the initial visit and conversation, Moser called and visited Muster's office

numerous times to debate the use of Novocain instead of Lidocaine. Dr. Muster testified that Novocain has not been used since the 1960s because of a high incidence of allergic reactions. On one of Moser's subsequent visits to the office during which he discussed anesthetics with Dr. Muster, Muster felt "intimidated" and "unsure of [Moser's] mental stability," so he called the police. Muster also testified that he reported the dental neglect to authorities because the infections posed a serious medical risk to S.M., including the risk of death, and Muster was not confident that Moser would be able to follow through with treatment, given his insistence on the use of Novocain.

{¶ 15} Dr. Kyle Hensley, a pediatric dentist, testified that Moser and the MCCS caseworker came to him in March 2009 about S.M.'s teeth. Like Muster, Hensley recounted that all of S.M.'s primary molars had cavities and that many teeth were "nonrestorable." Hensley recommended surgery because of the significant amount of decay and because the child was "uncooperative" with and "leery" of being examined. Hensley testified that the extent of decay in S.M.'s teeth would have taken years to develop, and that infection from his teeth and gums could seep into his bloodstream and cause problems with his brain or heart.

{¶ 16} Like Muster, Hensley testified that Moser wanted S.M. treated with Novocain, which had not been used in thirty to forty years, or, in the alternative, that Moser wanted S.M. "to actually be strapped down and just numbed and treated in the office." Hensley described such an approach as "cruel" and stated that he "would never treat anyone in the office that way that needed the amount of care that [S.M.] needed." Moser eventually agreed to have Hensley perform the surgery.

{¶ 17} S.M.'s surgery was to be performed at Children's Medical Center. James Doebele, a pediatric anesthesiologist, met with Moser and S.M.'s mother prior to the surgery to explain his plans and check the child; Moser had also requested and picked up a list of the medications Doebele planned to use a few days prior to the surgery. Doebele testified that, when he met with Moser, Moser had "a lot of reservations about most, if not all, those medications." Moser attempted to exclude many medications from his consent form, but the hospital would not allow him to do so. Doebele stated that the proposed medications were "medically sound, safe and necessary," that "quite a lot of time [was] spent in discussion" with Moser, and that his interaction with Moser was a "most unusual situation," "quite an ordeal." In Doebele's view, Moser's concerns were "quite extreme, quite irrational," and both he and the dentist had doubts about proceeding with the surgery in light of Moser's continued resistance. With the help of the caseworker, the procedure did go forward.

{¶ 18} Moser also testified at the hearing, but he had fired his attorney, and his testimony was unfocused. He spent a significant amount of effort attempting to convince the court as to the benefits of Novocain over Lidocaine, which he believed could cause cardiovascular collapse.[2] More generally, Moser stated that he had "religious objections to medicines" and viewed them as "poisons." He also challenged Dr. Muster's explanation, in their earlier conversations, that the copper serpent on the medical symbol, or caduceus, was a symbol of healing. Moser

---

[2]The trial court repeatedly redirected Moser's attention, pointing out that his views on these specific medications were not the issue before the court.

suggested that the dentists could have used a "papoose" to restrain S.M. for the dental procedure and that the child's natural production of epinephrine, or adrenaline, would have helped him through the procedure. Moser admitted that he had been diagnosed as "schizoeffective" and had recently been involuntarily committed to a hospital, but he stated that he was not taking medication. Moser did not dispute the dentists' or anesthesiologist's accounts of their conversations about his son's treatment.

{¶ 19} After the hearing, the magistrate found that Moser had an "irrational level of obsessive concern" and distraction with details that prevented him from "sufficiently parenting" his children. Further, the magistrate found that Moser was angry and aggressive in the courtroom, was unable or unwilling to follow the court's instructions, and that his significant mental health issues "caused the court great concern about [his] ability to act and talk appropriately with his children." The magistrate was also troubled by Moser's "willingness to subject [S.M.] to great pain in order to satisfy his concerns about anesthesia," despite the fact that those concerns were not shared by any of the medical professionals.

{¶ 20} The magistrate found that S.M. was a dependent and neglected child, that his siblings, C.M. and D.M., were dependent children, and that it was in the children's best interests to grant temporary custody to their mother on the condition that the children's contact with Moser be supervised and limited. The court also approved the case plan developed by MCCS. Having thoroughly reviewed the record, we conclude that the trial court did not abuse its discretion in reaching these conclusions.

{¶ 21} Moser's appellate counsel identified religious discrimination as a potential assignment of error. However, at trial, Moser did not identify any particular religious beliefs upon which his opposition to the various medications that had been proposed was based. His general assertion that he had religious objections and that the medications were "evil" provide an insufficient basis for us to conclude that he was discriminated against based on his religious views.

{¶ 22} We have also considered, as a potential assignment of error, the fact that Moser was not represented by an attorney throughout these proceedings. A parent is entitled to representation by legal counsel at all stages of the proceedings under Chapter 2151, including the right to have counsel appointed if the parent is indigent. R.C. 2151.352; Juv.R. 4(A). However, a parent can waive this right. See *In re Ramsey Children* (1995), 102 Ohio App.3d 168, 169-170.

{¶ 23} The record demonstrates that Moser strongly resisted his initial representation by attorney James Armstrong, because the attorney allegedly insulted S.M.'s "Jewish name," gave Moser "bad 'vibes,'" and was deliberately working toward the destruction of Moser's family and marriage. The magistrate stated that "the Court will not insist the father be represented by counsel," but it also refused to allow further delay as a result of counsel's dismissal, noting that Moser had "already been directly responsible for some delay, and indirectly responsible for more." The court concluded that "father has persisted sufficiently in his quest for dismissal of counsel," and that resolution of the arrangements for the children and the need to commence services for the parents weighed against further delay.

{¶ 24} After attorney Armstrong was dismissed at Moser's request, the trial

court appointed an attorney, Jeffrey Livingston, to serve "in the dual role of attorney and guardian ad-litem" for Moser, due, in part, to his indigency. Although the entry reflecting Livingston's appointment to this role was not filed until several months after the hearing, Livingston was present at and participated in the hearing. Moser also participated at the hearing in a manner that suggests he was representing himself. The issue of Moser's representation was not addressed at the hearing.

{¶ 25} After the hearing, Moser filed objections to the magistrate's decision and a petition for custody, visitation, or support modification on his own behalf. Later, he filed an affidavit of indigency, and another attorney, Patrick Conboy, was appointed to represent him.

{¶ 26} From the record, it is unclear to what extent, if any, Livingston provided legal advice to Moser during the period when Moser was unrepresented by other counsel. However, even assuming that Moser was unrepresented by counsel, the trial court's entry allowing Moser's first attorney to withdraw suggests that Moser had repeatedly asserted his desire to represent himself. And the trial court's appointment of a guardian ad litem who was also an attorney served to protect Moser, to some extent, from his desire to represent himself. When Moser later requested an attorney, a separate attorney was appointed. When Moser filed his notice of appeal, he was again acting pro se, and he asserted his desire to represent himself on appeal. To the extent that there were gaps in his representation, these gaps were created by Moser's own insistence that he represent himself.

**{¶ 27}** Although representation by an attorney may have been preferable, the record contains significant evidence that Moser did not want an attorney to participate on his behalf. Considering Moser's actions and the fact that these proceedings only determined temporary custody of the children, we conclude that the trial court acted reasonably in handling the matter as it did. We find no arguably meritorious issue for appeal related to Moser's legal representation.

**{¶ 28}** The judgment of the trial court will be affirmed.

. . . . . . . . . .

GRADY, P.J. and DONOVAN, J., concur.

Copies mailed to:

Carley J. Ingram
Bradley Baldwin
Adrian King
Jeffrey Livingston
Sam Moser
Hon. Nick Kuntz