[Cite as *In re J.S.*, 2013-Ohio-5756.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

IN THE MATTER OF: J.S., JR., D.S.,   :
N.S. and M.S.

                                     :

                                          C.A. CASE NO. 2013 CA
                                          48

                                     :    T.C. NO. 2011-424, 425,
                                          426

2012-787

                                     :

                                          (Civil    appeal    from
Common

                                     :     Pleas  Court,  Juvenile
                                          Division)


. . . . . . . . . .

**O P I N I O N**

Rendered on the 27th day of December, 2013.

. . . . . . . . . .

PAMELA L. PINCHOT, Atty. Reg. No. 0071648, 1800 Lyons Road, Dayton,
Ohio 45458
        Attorney for Appellant Father

LISA M. FANNIN, Atty. Reg. No. 0082337, Assistant Prosecuting Attorney, 50
E. Columbia Street, 4th Floor, P. O. Box 1608, Springfield, Ohio 45501
        Attorney for Appellee State of Ohio

DAVID MORSE, Atty. Reg. No. 0072714, 12 S. Central Avenue, Fairborn, Ohio
45324
        Attorney for Appellee Mother

. . . . . . . . . .

FROELICH, J.

{¶ 1} Father appeals from a judgment of the Clark County Common Pleas Court, Domestic Relations Division, Juvenile Section, which granted permanent custody of his four children, J.S., Jr., D.S., N.S., and M.S., to Family and Children Services of Clark County (FCSCC).

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3} The four children share the same parents, and the parents live together. J.S., Jr., D.S., and N.S. were placed in the temporary custody of FCSCC in March 2011, based on the court's findings that they were dependent. Specifically, FCSCC was concerned that the parents were not adequately managing N.S.'s medical conditions, including a serious kidney disorder and failure to thrive, and that the parents' mental health, domestic violence, and the condition of the home put the children at risk. M.S. was born in May 2012, was adjudicated to be dependent, and was also placed in the temporary custody of FCSCC. The children were placed in a foster home together.

{¶ 4} FCSCC developed a case plan aimed at reunification of the family and provided numerous services for the parents and children. Additional concerns arose regarding medical conditions of all of the children, the parents' abilities to care for the children's needs, drug and alcohol abuse by Father, and the mental health of both parents. The parents eventually satisfied many goals of their case plans, and they visited with the children regularly throughout the period of temporary custody. Questions remained, however, about their abilities to independently parent the children.

{¶ 5}     In July 2012, FCSCC filed a motion to modify its temporary custody of the children to permanent custody.   Hearings were conducted on February 26, April 1 and April 2, 2013, after which the trial court granted FCSCC's motion for permanent custody.

{¶ 6}     Father appeals, raising two assignments of error.

{¶ 7}     The first assignment of error states:

THE TRIAL COURT ERRED IN FINDING THAT THE MINOR CHILDREN NAMED HEREIN COULD NOT BE PLACED IN THE CUSTODY OF [FATHER] WITHIN A REASONABLE PERIOD OF TIME AND THE COURT FURTHER ERRED IN FINDING THAT IT WAS IN THE BEST INTERESTS FOR THE MINOR CHILDREN TO BE PLACED IN THE PERMANENT CUSTODY OF THE AGENCY AS THE AGENCY FAILED TO PROVE EITHER PROPOSITION BY CLEAR AND CONVINCING EVIDENCE.

{¶ 8}     Father claims that FCSCC did not prove that the children could not be placed with him within a reasonable period of time or that permanent custody was in the children's best interest.   He bases his argument on testimony that he had met his case plan objectives and that the condition of his home had improved, and on having obtained employment.

{¶ 9}     In Ohio, a trial court is authorized to terminate parental rights and to grant permanent custody to a children services agency in several enumerated circumstances. These circumstances include a finding, by clear and convincing evidence, that permanent custody is in a child's best interest, coupled with a finding that the child 1) cannot be placed with either

parent within a reasonable period of time or should not be placed with either parent, for one of the reasons specified in R.C. 2151.414(E), or 2) has been in the temporary custody of a public children services agency for twelve or more months of a consecutive twenty-two-month period. R.C. 2151.414(B); *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8. The burden of proof is on the children services agency. *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14.

{¶ 10}   In this case, FCSCC alleged in its complaint for permanent custody that the three oldest children, J.S., Jr., D.S., and N.S., had been in its temporary custody for twelve or more months of a consecutive twenty-two-month period. With respect to all the children, FCSCC alleged that they could not and should not be placed with either parent within a reasonable time.

{¶ 11}   We review a trial court's decisions regarding the best interest of a child and whether the child can be returned to the parent's care within a reasonable time for an abuse of discretion. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48; *In re K.H.*, 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 66. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *In re D.H.*, 10th Dist. Franklin No. 11AP-761, 2012-Ohio-2272, ¶ 9, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983); *In re S.M.,* 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 4.

{¶ 12}   R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the

interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶ 13}    R.C. 2151.414(E) identifies factors for determining whether a child cannot or should not be placed with either parent within a reasonable time.  If a court finds, by clear and convincing evidence, that any one of the R.C. 2151.414(E) factors exists, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.  *In re H.T. & Z.T.,* 2d Dist. Greene Nos. 10-CA-29, 10-CA-30, 2011-Ohio-1285, ¶ 23; *In re K.B.F.*, 2d Dist. Montgomery No. 24891, 2012-Ohio-1855, ¶ 51.  These factors include, among all other relevant factors, the parent's failure continuously and repeatedly to substantially remedy the conditions that caused the child to be placed outside the home, chronic mental illness, "mental retardation," or chemical dependency of the parent that makes the parent unable to provide an adequate permanent home at the present time or, as anticipated, within one year of the hearing.  R.C. 2151.414(E)(1)-(2).

{¶ 14}    The State presented the following evidence at the hearings.

{¶ 15}    According to the guardian ad litem, in March 2011, a  "medically fragile child" (N.S.) "brought [the family] into the radar."  N.S. was the parent's third child.  He was diagnosed with renal vascular failure; one of his kidneys was not

functioning, and his blood pressure was very elevated. At medical appointments related to this condition, the parents were unable to provide pertinent information about N.S.'s condition; there were also concerns about the parents' ability to administer his medication properly, as evidenced by "tremendous spikes in blood pressure" that were very dangerous for a child his age. The foster mother described N.S.'s condition as "near death" at the time of his placement in her home. N.S.'s blood pressure stabilized immediately when he was placed in foster care.

{¶ 16} N.S. was also diagnosed with failure to thrive. Prior to N.S.'s removal from the parents' home and during subsequent visits, the parents were instructed to administer certain medications and to feed him every two hours. Case workers, the child's grandmothers, and the foster mother color-coded the medications or otherwise marked the dispensers to inform the parents of the appropriate dose. However, the right doses were not always administered.

{¶ 17} Dr. Abiodun Omoloja treated N.S. soon after his birth due to his failure to thrive. Dr. Omoloja testified that the parents initially provided an adequate history of the child's condition, but he experienced many problems and concerns thereafter regarding their care for the child and follow through with appointments. He stated that N.S.'s medications were color-coded to help the parents administer them, but that a series of problems caused him serious concerns about the parents' abilities to administer the medications properly. The problems included the parents' running out of medication more quickly than they should have, not bringing medications to appointments as instructed, giving the wrong amounts of medications, failure to make or keep follow-up appointments, and failure to pick up prescriptions at the pharmacy. Dr. Omoloja contacted N.S.'s primary care physician and a

social worker at Rocking Horse Center due to his concerns. Dr. Omoloja testified that home health care had "not been particularly helpful" in addressing these problems, and he had suggested to the Rocking Horse caseworker that a "medical foster family" might need to be considered. Dr. Omoloja testified that N.S.'s unmanaged high blood pressure had contributed to his failure to thrive and had "definitely caused some organ damage" to his remaining kidney and possibly to his heart.

{¶ 18} Once N.S. was placed in foster care, his blood pressure stabilized, which facilitated the diagnosis of his underlying condition. Doctors determined that N.S.'s renal artery was congenitally blocked; subsequently, one of his kidneys was removed. However, he required medication, monitoring of his blood pressure and side effects related to the medication, and appropriate diet after the surgery. The foster mother testified that she personally instructed the parents about N.S.'s medication every time he went for visits, but that his blood pressure was sometimes "off" when he returned. The caseworker testified that N.S. was stable but that his "condition can change instantly;" accordingly, his caregivers needed to know what symptoms were problematic. The Mother would sometimes report significant sleepiness by N.S. during a visit, but the parents did not seem to understand that this was a warning sign of a problem with his medication level and/or blood pressure.

{¶ 19} At their removal from their parents' home, J.S., Jr. and D.S. were confused, disoriented and delayed in their development. J.S., Jr., the oldest child, had virtually no verbal skills at age three, and the one word that he could use well was a "swear word." According to the guardian ad litem, the behavior of all of the children, but especially J.S., Jr., had "consistently been an issue." J.S., Jr. acted

out at visits with his parents, including spitting, cursing, and kicking, behaviors which had not been observed at the foster home. The guardian ad litem believed that Mother was afraid of J.S., Jr. The caseworker testified that J.S., Jr. "tests their [the parents'] limits" and does not listen to them, and that his behavior with his parents was "wild" compared to that exhibited with the foster family.

{¶ 20} According to Shelly Robbins, a nurse at the Rocking Horse Center who was contracted through the Department of Job and Family Services, there had been gaps in J.S., Jr.'s care, including the parents' failure to get treatment for his torticollis, a condition in which the tightening of muscles on one side of the neck causes twisting of the head to one side. J.S., Jr. was behind on his shots and had only ten recognizable words when he was almost three years old. J.S., Jr. had "significant developmental delays," could not follow simple directions, and had disorders related to receptive expressive language and developmental coordination. Interventions had been recommended for the family but had not been followed. After J.S., Jr. was placed in foster care, however, he regained some ground on his developmental delays, spoke well, interacted with other children, and had no gross or fine motor delays. Robbins described J.S., Jr. as making "incredible strides" in foster care.

{¶ 21} D.S. had crossed eyes and was supposed to wear eyeglasses for her condition, but the parents did not follow through making her wear the glasses. When she was removed from the parents' home, the glasses could not be found. Robbins testified that the parents had been referred to the Children's Hospital Ophthalmology Department, but that they had not followed through with treatment. D.S. was not current on her shots when living with her parents. D.S. had surgery

to correct her crossed eyes while in foster care. Following the surgery, it was very important for her to wear her glasses to bring her eyes back to center and to prevent the risk of loss of vision.

{¶ 22} Like N.S., M.S. had been diagnosed with failure to thrive, and there were concerns about his feeding soon after his birth. M.S. exhibited projectile vomiting, spitting up, and spasticity in his upper extremities. He was diagnosed with severe acid reflux, which required surgery. According to the guardian ad litem, the parents did not seem to grasp that M.S.'s condition was more serious than spitting up. M.S. could not sit up, had no muscle tone, and was being evaluated for cerebral palsy. At the time of the hearing, his medical team still had not definitively diagnosed his condition.

{¶ 23} The foster mother testified that, although the parents attended many of the children's medical appointments, they (the parents) did not interact or ask questions. Sometimes Father would stay in the waiting room playing with one of the children, even if another adult was present to watch the child. The foster mother questioned the parents' understanding of the care the children required. The caseworker also testified that the parents did not participate at doctor appointments, although they often attended, and that they did not seem capable of recognizing the warning signs that would be present when N.S.'s blood pressure medication was given in the wrong amount.

{¶ 24} Dr. Daniel Hrinko, a psychologist, testified that Father had received special education services in school due to learning disabilities. Father had been involved in mental health counseling for most of his life, since age 5, and took numerous medications for mood stabilization, impulse control, suicidal thoughts, and destructive behaviors. Dr.

Hrinko concluded that Father had a low understanding of the importance of stability to his children, that he needed anger management training, and that he needed to understand the importance of taking a leadership role in the lives of his children. Although Dr. Hrinko placed Father in the low average range of intelligence, Dr. Hrinko found that Father had the cognitive ability to help with the children, but lacked the awareness of the importance of doing (or failing to do) what the professionals recommended for the children. Because Father had many other problems, such as his mental health, that interfered with his ability to function as a parent, Dr. Hrinko concluded that he was not capable of being a safe, appropriate, independent parent to these children. Similarly, Dr. Hrinko concluded that Mother's cognitive limitations and emotional challenges stood in the way of her ability to keep herself healthy, much less to attend to the needs of her children appropriately.

{¶ 25} Mother was heavily dependent on others, including Father, with whom she frequently fought. For example, Mother could not explain to the guardian ad litem her own medical conditions or what medication she was taking. Father helped Mother with her medications. The children's maternal grandmother, Brenda, was enlisted by FCSCC to check on the parents' house before scheduled visits, to ensure that it was in an acceptable condition, and to check on the children during extended visitations. Brenda was "very involved" and frequently helped with the children. When Mother cared for the children, including one occasion in which the children were returned to Mother and Father for an extended visit while the foster parents tended to an out-of-town family emergency, Mother was quickly "overwhelmed" and suicidal and called Brenda for assistance; the foster family's trip was cut short because Mother and Brenda were unable to handle the situation.

{¶ 26} According to the guardian ad litem, "the more responsibility that we placed on the parents, the greater it highlighted their dependency on others just to meet their own needs, and that was concerning." Dr. Hrinko stated that Mother was not "properly equipped" to be "a safe, appropriate and effective independent parent for children."

{¶ 27} According to the guardian ad litem, the parents lost some of their public benefits due to "fraud," because they did not inform the appropriate agencies when the children were removed from their home. They had also reached "their max on cash assistance" during a period when their children were not in the home, such that they would be ineligible for additional benefits if they got the children back. The parents were unable to understand and/or comply with the requirements for obtaining gas cards to assist them in getting to appointments. The parents were "very stressed out" about their financial situation and "did not know how they were going to make it." They ran out of household items, like food and diapers, and struggled to pay their bills.

{¶ 28} Father's case plan included attending Narcotics Anonymous at McKinley Hall due to his marijuana use, completing parenting classes, obtaining employment, and improving the condition of the house. Although there were some improvements in the condition of the house during visitations, the parents were often doing chores at visits, although the children were only at the home for visitation one day per week. Father did not follow through with his stated plans to correct some of the problems with the house, such as the poor condition of the yard. Father left discipline to Mother, despite her struggles with this issue. Father exhibited angry outbursts directed at the guardian ad litem, the foster father, and the caseworker.

{¶ 29}    According to case workers assigned to the family, including those who supervised visitation, and the guardian ad litem, Father had a very short attention span.  He would play with toys and books at the children's medical visits, and it was hard for him to stay still and concentrate.

{¶ 30}    A "service worker" who attended visitations expressed her opinion that it would be "a grand struggle" for the parents to raise these children without society's intervention and community resources.  The caseworker testified that she had made every reasonable effort to help the family and had offered every available service to this end.  She acknowledged that the maternal grandmother had provided a lot of support, but that this level of support had not been enough to keep the children safe and well-cared-for in the past.  She opined that the children were at high-risk if returned to the parents' home, that a safe, stable home was in their best interest, and that they were adoptable.  The caseworker (Lewis) also stated that, in her opinion, that parents were "not able to provide the consistency that the kids would need."  According to Robbins, the nurse from the Rocking Horse Center, all of the children needed a placement where the caregivers had a heightened awareness of the children's needs, because they were all going to continue to have medical and/or developmental issues.

{¶ 31}    The guardian ad litem stated his opinion that the parents could not meet the needs of these children, either together or independently, and he emphasized the children's need for a permanent home.  "The medical needs, the long-term needs, we still have so many uncertainties, especially with [N.S.]'s long-term care, with [M.S. ]'s long-term care, the development of [J.S., Jr.] is still - - he is being held back in school, he's obviously developmentally delayed * * * ."  With respect to D.S., the guardian ad litem stated that the

eye problem had been surgically corrected, but that if she did not wear her glasses, the eye could reverse and "get stuck," which would be a problem.

{¶ 32} Mother and Father also testified at the hearing. Mother acknowledged some instances of domestic violence and that N.S. had almost died after his birth. She also testified that she [Mother] had experienced anxiety and depression. When asked about her plans if the children were returned to her, Mother stated that she would "play with them more" and take them to the zoo and dinosaur museum. She indicated that she cares about the children more than Father does.

{¶ 33} Father testified about prior domestic violence charges and drug usage, but he claimed that pictures of him on MySpace and/or Facebook that showed him smoking marijuana were outdated and were attributable to his friends; he stated he had been "staying clean" of marijuana for 10 months. He described his medical diagnoses as ADHD and biploar disorder. His plan for the children upon reunification was to get the kids in school and on a schedule, using a dry erase board; his plan included only cursory references to doctors' appointments or the children's medical needs. He also stated that, when Mother needs help with the children, she can call one of the grandmothers or call him at work. He had been employed at Bob Evans for one month at the hearing. He had attended Narcotics Anonymous, but had been referred for reassessment due to a positive drug test.

{¶ 34} The trial court concluded that the children could not be placed with either parent within a reasonable period of time or should not be placed with either parent, and that it was in their best interest to grant permanent custody to FCSCC. The court stated that Father "lost significant credibility" on the witness stand because he did not seem to

understand questions or seemed "flippant" in his answers. "He was often forgetful and/or unable to answer simple questions. He downplayed or ignored his limitations. He minimized the concerns the court has for the well-being of children. He offered little evidence that he had made any meaningful changes in his thought process, his lifestyle, or his ability to be a parent." The court found that Father's "most glaring lapse in judgment" was with regard to the medical care of the children: "Many, many times the record demonstrates that the father was advised of the significant medical needs of his children, and he ignored the pleas of others to assist. He had failed to recognize the severity of their illnesses and * * * the significance of the medical needs of his children, and the need for timely and appropriate intervention."

{¶ 35} Father contends that the State did not prove, by clear and convincing evidence, that the children could not be returned to his care within a reasonable period of time or that it was in the children's best interest to grant permanent custody. However, these findings were supported by the record. Although Father complied, technically, with the case plan objectives, his compliance had not meaningfully advanced his ability to care for the children's needs. For example, he attended doctors' appointments with the children, but he was not engaged and did not seem to understand the medical conditions or the treatments.

{¶ 36} The State established that Father had not shown a willingness, inclination, and/or ability to adequately address the children's medical conditions and developmental disabilities. The State also established that the parents's own mental health issues, which they struggled with or need assistance to manage, impeded their ability to address their

children's needs. Moreover, despite extensive intervention and provision of services, the parents did not appear to have made any significant progress toward managing the needs and care of their children. When visitation was extended, Mother was quickly overwhelmed, and Father did not meaningfully intervene to assist her.

{¶ 37} The trial court did not abuse its discretion in concluding that the award of permanent custody to FCSCC was in the children's best interest, and that they could not or should not be returned to the parents' care within a reasonable time. Moreover, the State had established, with respect to J.S., Jr., D.S., and N.S., that they had been in the temporary custody of FCSCC for twelve or more months of a consecutive 22-month period.

{¶ 38} The first assignment of error is overruled.

{¶ 39} The second assignment of error states:

THE TRIAL COURT ERRED TO THE PREJUDICE OF [FATHER] BY ALLOWING THE CASA/GAL TO ENGAGE IN THE UNAUTHORIZED PRACTICE OF LAW.

{¶ 40} Father contends that the guardian ad litem for the children, who was not an attorney, engaged in the unauthorized practice of law at the hearing by questioning the witnesses, and was then improperly allowed to testify on rebuttal after hearing all of the testimony at the hearing. Father contends that an attorney would be prohibited by the "Professional Rules of Responsibility" from serving as a witness in a case in which he also acted an as attorney. Father claims that the guardian ad litem was biased against him in matters related to the case, that he asked leading questions, and that he was argumentative in his questioning of Father. Father claims that this "improper behavior" on the part of the

guardian ad litem was "permitted and encouraged by the trial court."

{¶ 41}  The guardian ad litem was permitted to question some of the witnesses in the case.  Due, perhaps, to the fact that he was not an attorney, the guardian ad litem's questioning was inartful.  For example, he asked compound, confusing, and leading questions.  His questions were also sometimes based on events in which the guardian ad litem himself had been a participant, such as conversations at team meetings, and, in an attempt to get the witness to agree to a version of what had happened, some of the guardian ad litem's questions encompassed an element of non-sworn testimony.

{¶ 42}  Although not cited by the parties, we note that Gov. Bar. VII(2)(A)(1) defines the unauthorized practice of law as "the rendering of legal services for another by any person not admitted to practice in Ohio."  And Sup.R. 48(D), related specifically to guardians ad litem, states that "[a] non-attorney guardian ad litem must avoid engaging in conduct that constitutes the unauthorized practice of law, be vigilant in performing the guardian ad litem's duties and request that the court appoint legal counsel, or otherwise employ the services of an attorney, to undertake appropriate legal actions on behalf of the guardian ad litem in the case."  Sup.R. 48(D)(5).  Considering these rules, we share Father's concern that the questioning by the guardian ad litem in this case was inappropriate and constituted the unauthorized practice of law.  *See Cleveland Bar. Assn. v. CompManagement, Inc*. 111 Ohio St.3d 444, 2006-Ohio-6018, 857 N.E.2d 95, ¶ 67 (stating that "any direct questioning of a witness would indisputably constitute the practice of law.")

{¶ 43}  In the larger context of the case, however, we are unpersuaded that Father suffered any prejudice as a result of the guardian ad litem's questioning of witnesses.  The

testimony elicited by the guardian ad litem was largely duplicative of other testimony, he did not question every witness, and his questioning was relatively short. Moreover, the trial court frequently required the guardian ad litem to rephrase his questions insofar as they were confusing or leading.[1]

{¶ 44} We also note that Father has cited no authority for the proposition that a non-attorney guardian ad litem's questioning of witnesses, while a violation of supreme court rules, mandates a reversal of the trial court's decision. "[T]he Rules of Superintendence are only general guidelines for the court to follow * * * and do not give rise to substantive rights. Sup.R. 48 is a general guideline that does not have the force of statutory law, [and thus,] an appellant does not have any substantive right to enforce it. In other words, the Ohio Rules of Superintendence are purely internal housekeeping rules which do not create substantive rights in individuals or procedural law." (Internal quotations and citations omitted.) *In re R.S.,* 4th Dist. Highland No. 11CA29, 2012-Ohio-2016, ¶ 41.

{¶ 45} The second assignment of error is overruled.

{¶ 46} The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, P.J. and DONOVAN, J., concur.

Copies mailed to:

---

[1] We note that none of the participants at the hearing objected to the guardian ad litem's manner of participation, including his questioning of witnesses. We express no opinion as to whether such a failure to object would constitute a waiver of the error, in circumstances where the non-attorney's questioning were not harmless.

Pamela L. Pinchot
Lisa M. Fannin
David Morse
Hon. Joseph N. Monnin