[Cite as *In re M.C.*, 2023-Ohio-3979.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE M.C. | : | |
| | : | No. 112543 |
| A Minor Child | : | |
| | : | |
| [Appeal by Mother, M.J.] | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 2, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-22910402

### *Appearances:*

Wegman Hessler Valore and Dean M. Valore, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

LISA B. FORBES, P.J.:

{¶ 1} Appellant, M.J. ("Mother") appeals the juvenile court's order committing her minor child, M.C., to the temporary custody of the Cuyahoga County Division of Child and Family Services ("CCDCFS"). After reviewing the facts of the case and the pertinent law, we affirm.

## I.   Facts and Procedural History

{¶ 2}   In August 2021, CCDCFS was made aware that Mother had chained M.C. to her bed at night.  CCDCFS's involvement began in light of that incident.

{¶ 3}   Pertinent to this appeal, on October 13, 2022, CCDCFS filed a complaint requesting temporary custody of M.C. alleging that she was abused and dependent.  On the same day, CCDCFS filed a motion requesting emergency temporary custody of M.C.  The juvenile court granted CCDCFS emergency temporary custody on October 18, 2022.

{¶ 4}   The court held an adjudication and disposition hearing on CCDCFS's complaint on January 10, 2023.  A magistrate's decision was journalized on January 12, 2023, adjudicating M.C. abused and dependent and awarding CCDCFS temporary custody.  Mother filed an objection to the magistrate's decision on January 26, 2023.

{¶ 5}   The juvenile court overruled Mother's objection and adopted the magistrate's decision on February 12, 2023.  It is from this order that Mother appeals.

## II.   Hearing Testimony

{¶ 6}   At the January 10, 2023 hearing, the juvenile court heard testimony from three witnesses, and M.C.'s guardian ad litem ("GAL") gave a recommendation on the record.  The following pertinent testimony was presented.

## A. Alyssa Rachid

{¶ 7} Alyssa Rachid ("Rachid") testified that she has been the CCDCFS case worker assigned to M.C.'s case since November 2021. At the time of the hearing, M.C. was 13 years old.

{¶ 8} Rachid explained that in August 2021, CCDCFS was made aware that Mother was "overwhelmed with [M.C.'s] behavior and using inappropriate discipline, [such] as chaining the child to her bed." Mother admitted to CCDCFS that "she chained the child to her bed with like a long chain where she could walk around the house, but to not allow her to leave the home." According to Mother, M.C. was sneaking out at night and Mother "didn't want her child running the streets."

{¶ 9} Mother and CCDCFS entered into a temporary custody agreement and cost-sharing plan pursuant to which M.C. was placed at Bellefaire, a residential facility. M.C. resided at Bellefaire from August 2021 through March 2022, and was discharged successfully because she met the facility's requirements.

{¶ 10} After her discharge, M.C. returned to Mother's home. M.C. lived at Mother's home for about two weeks when CCDCFS became concerned about M.C. and Mother's interactions. CCDCFS put into place "MST" services, which are in-home intensive therapeutic services that remained in place from February to May 2022. The goal of the MST services was teaching M.C. and Mother "how to cope with each other on behaviors when problems arise, how to de-escalate situations." For example, MST services sought to teach M.C. "calming techniques and things to

do when she finds herself escalated," and worked with Mother on "how to handle [M.C.'s] behavior when problems arise."

{¶ 11} According to Rachid, MST services were discontinued because of conflicting goals for M.C. between Mother and MST. MST wanted to keep M.C. in the home while "[M]other's goal was to have the child in residential" treatment.

{¶ 12} Asked whether CCDCFS was "aware of any police involvement with this family," Rachid responded that when M.C. was living in Mother's home and would try to sneak out or her "behaviors would arise," Mother would call the police to settle M.C. down or take her to the hospital "to try to get her admitted." Rachid testified that M.C. was never admitted to the hospital.

{¶ 13} According to Rachid, Mother reported to CCDCFS that she had been diagnosed with schizophrenia when she was 18 years old but was not taking any medication because "she does not believe in medications." CCDCFS asked Mother to undergo an evaluation to ensure that her mental health was "not interfering with the behavioral concerns and conflicts between" M.C. and Mother. Mother did not complete the mental-health evaluation.

{¶ 14} While M.C. was in the emergency temporary custody of CCDCFS she was placed in a foster home in Toledo for approximately five months. Rachid testified that at first, M.C. was doing well, but started to refuse therapy, began having "behaviors," and started getting into fights. During this time, M.C. visited Mother at Mother's home. Rachid was present for these visits and recalled one visit where there was an issue. According to Rachid, when Mother asked M.C. about a phone

call between the two of them the previous week, M.C. got "agitated." She ignored Mother's inquiries, instead leaving the house. M.C. went to the neighbor's backyard where she sat down and began crying. At that point, Mother followed her outside. They began yelling at each other. Eventually, Mother went back inside her house. M.C. told Rachid that she wanted to go back into the house to retrieve some of her belongings. When they went in, "Mother put herself in front of [M.C. and] refused to let [her] in the basement" where her belongings were. "[M]other pulled out her phone and started recording [M.C.] very upset * * *." Rachid stated that this was "the only visit where a serious conflict arose between" Mother and M.C.

{¶ 15} Asked what concerns CCDCFS had, which led the agency to seek temporary custody of M.C., Rachid identified the "inappropriate discipline of the chaining" M.C. to her bed, and "the interactions between them two, they kind of escalate each other. When one is mad or irritated, the conflict just arises because they go after each other."

{¶ 16} CCDCFS created a case plan with a permanency goal of reunification. Mother has a case-plan objective to "seek an evaluation and proceed with whatever is recommended * * * from mental health professionals" as a result of that evaluation. M.C. has a case-plan objective of "behavioral mental health * * * and also parent/child conflict, for family counseling * * *."

{¶ 17} In Rachid's opinion, at the time of the hearing, it was in M.C.'s best interest for CCDCFS to be granted temporary custody because Mother and M.C.

need to work on themselves with therapies and their own case plan goals to ensure when they can work together, come back together, and appropriately handle each other and * * * to be able to live together stab[ly].

## B. L.C.C.

{¶ 18} L.C.C. ("Father") testified that M.C. stayed with him in Kentucky for "about seven, eight months" in 2020. Father stated that he had "typical teenager" problems with M.C. while she stayed with him. Specifically, Father stated that M.C. had "a problem with authority." According to Father, M.C. moved back to Mother's house after "she walked off one day. We had words * * * she stormed out of the house, ran down the street, * * * and she came back * * * about an hour or two later." Father drove around to look for M.C., but when he could not find her he called the police. Father also called Mother who told him "to take [M.C.] to some facility * * *." Father took M.C. to a hospital where she stayed for a few days before being released.

## C. Mother

{¶ 19} Mother testified that she has had "problems with [M.C.] since she was seven, and [M.C. has] been climbing out of [her] window since seven, and she ha[s] insomnia. She don't sleep at night. She been in therapy." According to Mother, M.C. climbed out of her bedroom window "when she can't sleep to get air. She walks around until she gets tired and climbs back in." However, as M.C. has gotten older, she has been climbing out of her window "when she can't get her way" or when she is angry.

{¶ 20} According to Mother, the night she chained M.C. to her bed, Mother "wasn't even home. It wasn't no incident between us or nothing like that."

{¶ 21} Describing some of the challenges she has with M.C., Mother stated that M.C. is "not rational. She don't * * * think. She can't take authority figures." According to Mother, M.C. has "been diagnosed with ADHD, aggressive behavior disorder, insomnia, ODD, psychosis, [and] mood disorder." Mother explained her understanding that M.C.'s diagnosis for "psychosis * * * is like a form of schizophrenia." Mother testified that she had been trying to get M.C. diagnosed with schizophrenia "[b]ut they won't diagnose her because she's too young."

{¶ 22} Mother gave her version of events regarding the visit that Rachid testified about, where there was an issue between Mother and M.C. According to Mother, the disagreement began because Mother refused to buy M.C. a pair of Jordan shoes. Mother told M.C.

> I'm not buying you no Jordans. For one, you're going to have to do right. You're not even doing — you're in a foster home and you're not even doing what you're supposed to do there. You're flipping out on the lady. She's being nice, trying to take you in to help us, and you're disrespecting her, you're flipping out, you don't deserve no Jordans.

At that point, M.C. "started flipping out. * * * then she started crying. She ran to the side of the house." Mother told Rachid "just take her home, because she [is] taunting me." When Rachid told her she could not take her home, Mother told her to call an ambulance. Once M.C. came back inside, Mother stated that M.C. "just started taunting me. Like, I want my blanket." Mother told M.C. that she could get it at her next visit, but M.C. "started trying to barge * * * to the basement * * *." Mother asked M.C. to stop and asked Rachid to "get her." According to Mother, Rachid stood "there looking like she was waiting on like something to happen. Like [M.C.] to

attack me and me hit her back." At that point, Mother's cousin got involved and asked M.C. for a hug. M.C. hugged the cousin and started crying. Mother admitted that she recorded the incident with M.C. on her phone because she "record[s] everything."

{¶ 23} Mother testified that she was diagnosed with schizophrenia in high school but does not currently receive treatment for that diagnosis because she does not "have any schizophrenic issues." Mother further testified that she did not complete the mental-health evaluation that CCDCFS requested because she saw "what the Agency was doing." Mother has seen a therapist since July 2022 for anger management and stated that her therapist did not "see any signs of schizophrenia * * *."

{¶ 24} In Mother's opinion, M.C. would do better in her care because according to Mother, M.C. has gotten "worse" since CCDCFS has been involved. M.C. "needs to be around her family."

**D. GAL**

{¶ 25} The GAL testified that, at the time of the hearing, M.C. was placed in a residential facility. The GAL recommended that CCDCFS be granted temporary custody of M.C. because M.C. was benefitting from that placement, "and it would certainly be against her best interest to remove her from that facility." At first, M.C. struggled at her placement, however, the GAL reported that she was working very hard, engaged in therapy, and getting good grades.

### III. Law and Analysis

{¶ 26} Mother raises the following two assignments of error on appeal:

The juvenile court's findings that M.C. was abused and dependent are against the manifest weight of the evidence.

The juvenile court's finding that M.C.['s] return to [Mother's] custody was not in M.C.'s best interest is against the manifest weight of the evidence.

### A. Adjudication

{¶ 27} The juvenile court adjudicated M.C. abused pursuant to R.C. 2151.031(B) and dependent pursuant to R.C. 2151.04(B) and (C). In her first assignment of error, Mother challenges these adjudications.

{¶ 28} Pursuant to R.C. 2151.35(A):

If the court at the adjudicatory hearing finds from clear and convincing evidence that the child is an abused, neglected, or dependent child, the court shall proceed, in accordance with division (B) of this section, to hold a dispositional hearing and hear the evidence as to the proper disposition to be made under section 2151.353 of the Revised Code.

*See also* Juv.R. 29(E).

{¶ 29} "When an appellate court examines whether a trial court's judgment is based upon clear and convincing evidence, 'a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re C.O.*, 8th Dist. Cuyahoga Nos. 99334 and 99335, 2013-Ohio-5239, ¶ 30, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

### 1. Abuse

**{¶ 30}** At the time M.C. was adjudicated abused, R.C. 2151.031(B) defined an abused child as a child who

> is endangered as defined in section 2919.22 of the Revised Code, except that the court need not find that any person has been convicted under that section in order to find that the child is an abused child * * *.

**{¶ 31}** R.C. 2919.22 defines endangering children as

> (B) No person shall do any of the following to a child under eighteen years of age * * *:
>
> * * *
>
> (3) Administer corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of physical harm to the child.

The Legislative Service Commission Commentary to R.C. 2919.22 gives examples of violations of the statute, one of which is "chaining a child to his bed * * *."

**{¶ 32}** At the adjudication hearing, the magistrate explained "[w]hen you chain a 12-year-old child to a bed or anybody to a bed, that is abuse under the statute." The magistrate's decision concluded M.C. was abused. As noted, the trial court overruled Mother's objection to that finding and issued a journal entry finding that M.C. was abused.

**{¶ 33}** Mother admitted that she had chained M.C. to her bed at night. Specifically, Mother testified that on one evening in particular in August 2021, she chained M.C. to her bed and then left the house; Mother "wasn't even home." This testimony was sufficient to support the trial court's conclusion that M.C. was an

abused child. *See State v. Allington* 5th Dist. Coshocton No. 05-CA-2, 2005-Ohio-3818 (Affirming a conviction for child endangering where a child was chained to its crib so that it did not "wander off" and the child needed to be rescued from a smoldering home.). Therefore, the court's finding that M.C. was abused, pursuant to R.C. 2151.031(B), is supported by evidence in the record.

### 2. Dependency

{¶ 34} Mother further argues that the juvenile court erred when it adjudicated M.C. dependent. At the outset, we note that Mother did not object to the magistrate's decision finding M.C. dependent pursuant to R.C. 2151.04(B) and (C). Juv.R. 40(D)(3)(b)(iv) provides:

> Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion * * *.

{¶ 35} "It is well-established that failure to object to an issue in the lower court waives a party's right to challenge that issue on appeal absent plain error." *In re De.D.*, 8th Dist. Cuyahoga No. 108760, 2020-Ohio-906, ¶ 13.

{¶ 36} Mother filed the following objection to the magistrate's decision: "The magistrate['s] decision does not allow that the actions of the [M]other in restraining her child do not constitute child endangering or abuse as those terms are referred to in R.C. 2919.22(B)." Therefore, pursuant to Juv.R. 40, Mother has waived all but plain error with respect to the findings that M.C. was dependent.

{¶ 37} "Plain errors are errors in the judicial process that are clearly apparent on the face of the record and are prejudicial to the appellant." *Macintosh Farms*

*Community Assn., Inc. v. Baker*, 8th Dist. Cuyahoga No. 102820, 2015-Ohio-5263, ¶ 8.

> In applying the doctrine of plain error in a civil case, reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of and public confidence in, judicial proceedings.

*Goldfuss v. Davidson*, 79 Ohio St.3d 116, 120, 679 N.E.2d 1099 (1997).

{¶ 38} R.C. 2151.04(B) and (C) define a dependent child as a child:

(B) Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;

(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship;

{¶ 39} Here, the court heard testimony that Mother and M.C. have difficulty communicating and these breaks in communication escalate M.C.'s behavioral issues; Mother and M.C. get into verbal fights, to which Mother responds by taking M.C. to the hospital; in-home therapy services to teach Mother and M.C. how to communicate when disagreements arise were discontinued due to a lack of alignment on the goal of the services, specifically Mother wanted M.C. to be placed in residential care and MST service was working to keep M.C. in the home; and, Mother failed to submit to a mental health evaluation as required by CCDCFS in light of Mother's statement that she had been diagnosed with schizophrenia.

{¶ 40} Accordingly, we find that the juvenile court did not plainly err when it found that M.C. was dependent.

{¶ 41} Mother's first assignment of error is overruled.

**B. Disposition**

{¶ 42} In her second assignment of error, Mother challenges the juvenile court's finding that M.C.'s "continued residence in or return to the home of Mother, at this time, will be contrary to the child's best interest." We again note that Mother did not object to the magistrate's finding that M.C.'s return to her home was against her best interests. Therefore, pursuant to Juv.R. 40, Mother has waived all but plain error on appeal.

{¶ 43} Once the juvenile court adjudicated M.C. abused and dependent, the court was authorized to order any of the following dispositions: (1) placing the child in protective supervision; (2) committing the child to the temporary custody of the agency; (3) awarding legal custody of the child to either parent or another person; or (4) committing the child to the permanent custody of the agency. R.C. 2151.353(A). "[I]n choosing among the alternative dispositions authorized by R.C. 2151.353(A), the court's primary concern remains the best interest of the child." *In re K.E.*, 8th Dist. Cuyahoga No. 111443, 2022-Ohio-3333, ¶ 17. "A trial court has substantial discretion in weighing the considerations involved in making the determination regarding a child's best interest[.]" *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 3, citing *In re K.H.*, 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 66. "There is no specific test or set of criteria that must be applied to determine what is in a child's best interest when considering temporary custody as a dispositional alternative following an adjudication of abuse, neglect or dependency." *In re Q.S.*, 2023-Ohio-712, 210 N.E.3d 610, ¶ 119 (8th Dist.), citing *In*

*re G.G.*, 9th Dist. Summit No. 29952, 2022-Ohio-1654, ¶ 33. "Nevertheless, courts have held that the best-interest factors set forth in R.C. 2151.414(D)(1) and/or 3109.04(F)(1) — to the extent they are relevant — may be instructive in making that determination." *Id.*

{¶ 44} We note that "[a]n award of temporary custody to a public or private children's services agency is substantially different from an award of permanent custody, where parental rights are terminated." *In re Ka.C.*, 8th Dist. Cuyahoga Nos. 102000, 102002, 102005, and 102006, 2015-Ohio-1158, ¶ 20. In these cases, "the parent only loses temporary custody of a child and retains residual parental rights, privileges, and responsibilities." *Id.* "Furthermore, the parents may regain custody; it is not permanently foreclosed." (Citations omitted.) *In re K.E.* at ¶ 19. Here, while seeking temporary custody, CCDCFS had a permanency goal of reunification.

{¶ 45} The court heard from the GAL that M.C. was "doing much better" in her current placement. She is engaged in therapy, getting good grades, and "working very hard." The court also heard from Rachid that there were concerns regarding how Mother and M.C. interacted with each other. CCDCFS had implemented MST services prior to seeking temporary custody, but those services were discontinued due to Mother and MST's difference in objectives. Further, the court heard from both Mother and CCDCFS that Mother had been diagnosed with schizophrenia and that Mother had not completed a mental-health evaluation. Finally, the GAL recommended that CCDCFS be granted temporary custody.

**{¶ 46}** We find that the trial court did not plainly err in finding that M.C.'s return to Mother's home was against her best interests. *See* R.C. 2151.414(D)(1)(a); R.C. 3109.04(F)(1)(c) and (d).

**{¶ 47}** Mother's second assignment of error is overruled.

**{¶ 48}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
MARY J. BOYLE, J., CONCUR