[Cite as *In re Q.S.*, 2023-Ohio-712.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| IN RE Q.S., ET AL. | : | |
|  | : | No. 111416 |
| Minor Children | : | |
|  | : | |
| [Appeal by D.P., Mother] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 9, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD21909146, AD21909147, AD21909148, and AD21909149

*Appearances:*

D.P., *pro se*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Zachary J. LaFleur, Assistant Prosecuting
Attorney, *for appellee*.

EILEEN A. GALLAGHER, J.:

{¶ 1} Appellant-mother D.P. ("Mother"), pro se, appeals from the decision of
the Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile
court") granting temporary custody of four of her children to appellee, the Cuyahoga
County Division of Children and Family Services ("CCDCFS" or "the agency"). For
the reasons that follow, we affirm.

## I. Factual Background and Procedural History

{¶ 2} This appeal involves four of Mother's children: Q.S., Hers.S., Herb.S. and L.S. H.S. ("Father") is the father of the four children.

{¶ 3} On October 14, 2021, CCDCFS refiled a complaint for neglect, dependency and temporary custody of the children,[1] along with a motion for predispositional temporary custody. As it relates to Mother, the refiled complaint alleged: (1) the children have mental-health and behavioral issues, including exhibiting inappropriate sexualized behaviors with each other, that Mother is "unable to adequately address"; (2) Mother had not consistently ensured that the children receive recommended treatment and medication to address their emotional and behavioral issues; (3) Mother lacks the parenting skills necessary to address the children's behavioral needs, fails to properly supervise the children and minimizes the risks associated with the children's inappropriate sexualized behavior; (4) Mother has mental-health issues that interfere with her ability to provide a safe and appropriate home for the children; (5) Mother has substance-abuse issues with marijuana that interfere with her ability to provide adequate parental care and (6) Mother has two older children who were removed from her

---

[1] A prior complaint for neglect, dependency and temporary custody of each of the children was filed on July 16, 2021 (Cuyahoga J.C. Nos. AD21906069, AD21906070, AD21906071, and AD21906072). On July 15, 2021, the children were removed from Mother's home and placed in the emergency custody of the agency pursuant to an ex parte telephonic order. The case was not resolved within statutory time limits and was dismissed and refiled. The children have remained in the continuous custody of the agency since their removal on July 15, 2021.

care and committed to the permanent custody of CCDCFS due in part to her mental health and substance-abuse issues.

{¶ 4} With respect to Father, the complaint alleged: (1) Father has exposed the children to sexually explicit materials; (2) there is a conflict between Father and the children that prevents him from providing adequate parental care for them and (3) Father has a prior conviction for domestic violence. Mother denied the allegations of the complaint and objected to the agency's request for continued predispositional temporary custody of the children, arguing that the children should be returned to her care. Father likewise denied the allegations of the complaint but stipulated to the agency's request for continued predispositional temporary custody of the children.

## A. Emergency Custody Hearing

{¶ 5} On October 15, 2021, the magistrate conducted a Zoom hearing to determine whether there was a need for the children to remain in predispositional temporary custody pending proceedings on the refiled complaint (the "emergency custody hearing"). At the time of the hearing, the children had been in the emergency temporary custody of the agency for three months. Attorney Salvatore Amata ("Attorney Amata") with the Cuyahoga County Office of the Public Defender represented Mother at the emergency custody hearing.

{¶ 6} CCDCFS case worker, Gail Elmore, and Mother testified at the emergency custody hearing. At the time of the hearing, L.S. was seven years old, Herb.S. and Hers.S. were eight years old and Q.S. was nine years old.

## 1. Testimony by Agency's Witness

{¶ 7} Elmore testified that the children were removed from Mother's care on Thursday, July 15, 2021, following an incident that had occurred three or four days earlier in which the children had engaged in sexualized behaviors with each other. Elmore stated that, on the evening of July 14, 2021, the agency received an anonymous report (through the agency hotline) that the children had been engaged in sexualized behaviors while at home with Mother. Elmore stated when she spoke with Mother about the incident the following day, Mother told Elmore that the children had informed her that an incident had occurred the prior weekend in which two of the children had engaged in sexualized behaviors with each other and that she planned to discuss the incident at the family counseling session scheduled for later that week. Elmore further indicated that, when she spoke with the children about the incident, the children confirmed both that (1) the incident had occurred and (2) Mother was "aware of these behaviors."

{¶ 8} Elmore testified that the July 2021 incident was not the first incident involving sexualized behaviors among the children. Elmore stated that sexualized behaviors of the children was an "ongoing issue" and that she had been working with the family to address the issue since March or April 2020, when she was assigned the case by the agency's sex abuse department.

{¶ 9} Elmore testified that when she was assigned the case, Mother and the children were engaged in individual counseling through Family Solutions. Elmore stated that she referred the family to Ohio Guidestone's Protect Program, i.e., a

program that provides "specific counseling and therapy for children [who] exhibit sexualized behavior to assist them with understanding what's appropriate, what's not, and things like that * * * moving the children toward learning healthy relationships so that they are safe amongst themselves and that are safe around other children" and "tr[ies] to help support mom to keep the children safe from each other and other children."

{¶ 10} Elmore testified that the agency had received other "referrals" related to sexualized behavior among the children in January or February 2021, in April or May 2021 and in late June 2021. Elmore stated that the June 2021 referral resulted from a disclosure by one of the children to Mother (during a family counseling session) that the children had been engaging in sexualized behaviors with one another.

{¶ 11} Elmore testified that the agency did not seek immediate removal of the children from Mother's care after the agency received the referrals but, instead, continued to work with Mother. Elmore indicated that services were provided to Mother to educate Mother how to better manage and supervise the children to prevent such behaviors, including using "line-of-sight supervision" and making room changes so the children could be more closely monitored in the home.

{¶ 12} Elmore stated that, when asked about the reported sexualized behaviors of the children during a staffing conducted on July 16, 2021, Mother responded that she had "tried to do her best with monitoring the children" but that

she had to wash clothes and do other things and "could not watch the children all the time."

{¶ 13} Elmore testified that, in July 2021, there were also concerns regarding Mother's proper administration of prescription medication to the children, the children's "lack of regularity" in attending school and Mother's use of marijuana to manage issues with her mental health. With respect to the administration of medication, Elmore stated that although the children had been prescribed different dosages of a certain medication to be administered at different times, Mother was administering medication to all the children from a single bottle (rather than filling their individual prescriptions). Elmore further indicated that one doctor had removed himself from the case because the children's prescriptions were not being picked up timely. With respect to Mother's marijuana use, Elmore stated that, in late May 2021, she made an unannounced home visit to Mother's home and noticed a strong smell of marijuana. When she asked Mother about it, Mother replied that she had been smoking marijuana "to calm down." Elmore indicated that the children were at home and there was no one else was present to supervise the children while Mother was smoking marijuana. Elmore stated that, following that home visit, she referred Mother for a substance-abuse assessment and drug screens. Elmore indicated that, after several requests, Mother submitted to a urine screen that was positive for marijuana. She stated that Mother refused to provide a hair sample.

{¶ 14} Elmore testified that Mother completed a dual diagnosis assessment, i.e., a substance abuse and mental-health assessment, with Moore Consulting that resulted in a recommendation for dual diagnosis programming, which Mother completed. Elmore indicated that, as part of the Moore Consulting programming, Mother submitted to regular urine screens that indicated that Mother's THC levels were "reducing" but that Mother still needed to submit to random urine screens. Elmore stated that Mother had also been referred for a psychological evaluation and a personality assessment due to concerns regarding a "personality disorder" and that Mother still needed to complete the psychological evaluation (and comply with any related recommendations). Elmore indicated that Mother had completed a parenting program, but that she had not yet seen "demonstrated behavior that would support successful completion of the program."

{¶ 15} Elmore testified that, at that time, Mother had weekly visitation with all four children at the Jane Edna Hunter Building but that these visits had been "challenging." She stated that Mother told the children during the visits that no one was protecting them and that their foster parents were not taking good care of them, that Mother repeatedly called the children's father a pedophile in front of them and that Mother had to be frequently redirected not to discuss inappropriate topics with the children. Elmore indicated that Mother also had a difficult time managing her children's behavior at visits. She noted that the children would run around, hide and try to slide down the banisters, but that Mother did not intervene to manage the children's behavior. Elmore stated that she began to take another person with her

on supervised visits so that she could make sure the children were kept safe. She indicated that Mother had moved into a new home in September 2021 and that, once supportive visitation coaches were assigned, they would be moving towards supervised visitation in Mother's home.

{¶ 16} Elmore stated that all the children had been diagnosed with ADHD and that some of the children had also been diagnosed with PTSD, conduct disorder and oppositional defiant disorder. She stated that services were in place through Family Solutions to address those issues.

{¶ 17} Elmore testified that the agency's concerns, at that time, were the correct administration of the children's medicine, regular school attendance, Mother's ability to control the children's behaviors in the home and Mother's ability to keep the children safe from one another while the family was participating in the Protect Program. Elmore indicated that the family had not "benefit[ted] entirely" from the services that had been provided when the children were in Mother's care because, due to "a lot of chaos in the home," they were "not able to really be effective with their treatments" and that, despite the services in place, the children were still engaged in sexualized behaviors.

{¶ 18} Elmore testified that after the children were removed from Mother's home, they were placed in individual therapeutic foster homes so that they would not be able to act inappropriately with one another. She stated that the children would remain in those placements if emergency custody was continued. She indicated that there were other, older children in most of the foster homes and that

no inappropriate sexualized behaviors had been observed while the children were in their foster homes.

{¶ 19} Elmore testified that another child, S.H., who was then 17, had not been removed from Mother's home. She stated that S.H. had been participating in the Protect Program, was involved in sports and other school activities, was doing well academically and "had made such great progress" that it was "not necessary to remove him from the home."

{¶ 20} With respect to the children's wishes, Elmore stated that, at times, the children stated that they wanted to return home to Mother and that, at other times, they stated they wanted to remain in their foster homes.

## 2. Testimony by Mother

{¶ 21} Mother testified at the emergency custody hearing. She testified that she had moved into a new, appropriate home in August 2021 and that the children's sleeping arrangements would be consistent with the sleeping arrangements requested by the agency. Mother stated that she had been participating in counseling through Family Solutions since 2018 and that she also participated in weekly counseling at Ohio Guidestone. Mother stated that she initially sought counseling for the children through Beech Brook after they began "expos[ing] themselves in the classroom to other children and things of that nature" following "some abusiveness in the home." Mother indicated that, in September 2019, the children began receiving both therapy and case management services through Family Solutions and that the agency later referred the children to counseling

services through the Protect Program. Mother stated that she was not required to participate in the Protect Program herself but that she worked with each of her children's therapists "so they could teach me the tools that they were teaching the children so I could reinforce them in between sessions."

{¶ 22} Mother claimed that she always properly administered medication to her children and that because the children received "combination doses" of the same medication, she could properly administer medication to all the children without filling all their individual prescriptions, thereby reducing the number of pill bottles accessible in the home. Mother stated that she had received training regarding the medication issue, that she now understood the importance of filling (and administering medicine from) each child's prescriptions and that she would do so going forward.

{¶ 23} Mother admitted that she had smoked marijuana on April 24, 2021, the date of one of Elmore's home visits. Mother denied that the visit was an "unannounced" home visit. She stated that Elmore had called her and asked if she could stop by and that Mother responded that it was "a perfect time" for a visit. Mother stated that, at that time, her daughter had just made "severe allegations" of abuse. She indicated that she told Elmore that she had smoked marijuana to "aid in the coping of my PTSD" and "assist with me coping with the allegations." Mother acknowledged that she was the only person supervising the children when she used marijuana. Mother stated that, at the time, she did not have a prescription for medical marijuana, but that, at Elmore's suggestion, she later obtained a medical

marijuana card. Mother denied that she was a "regular" user or "a substance abuser of any kind" and stated that her marijuana use in April 2021 was an "isolated incident."

{¶ 24} Mother testified that she tested positive for marijuana in May 2021 and that, after the children were removed from her care in July 2021, Moore Consulting recommended that she complete a six-week nonintensive substance-abuse program that required complete abstinence from all substances and weekly urine screenings. Mother stated that she completed that program as well as a mental-health assessment. Mother indicated that THC levels in her urine were declining as she was being tested. Mother claimed that she has "always cooperated" with the agency and has been compliant with "whatever recommendations" were made by the agency.

{¶ 25} With respect to the July 2021 incident, Mother testified that she was in the basement doing laundry on July 11, 2021 when Herb.S. came downstairs and told her that he thought "there's something getting ready to happen" and that she "need[ed] to get upstairs right away." Mother stated that she "ran upstairs immediately," that the children told her that Hers.S. "made a request of his sister" and that she "immediately" contacted Elmore, who told her "to set up some emergency session with the providers," which she did. Mother stated that she contacted Regina Moses at Family Solutions and that Moses told Mother to "hold tight until Wednesday," the day of the family's next scheduled appointment, and Moses would then "teach [her] more tools [she] could use throughout the week."

Mother testified that this "did not happen" and that, instead, on Wednesday, July 14, 2021, Moses, came to her home and "assaulted" L.S. on the arm several times. Mother indicated that while the two women were "in a very vicious argument about her hitting my daughter," Moses "grabbed" one of her sons by the arm and "shook" him. Mother stated that she called Elmore and Elmore told her not to call the police, but "to call it into the hotline and she would support the apprehension of * * * Moses." Mother indicated that she did so and that Moses then phoned in a "scathing allegation" to the hotline, i.e., "[w]e called in on each other," which prompted the immediate removal of the children from Mother's care.

{¶ 26} Mother testified that the July 2021 incident was "the first incident in a very long time." She stated that in March 2021, one of the boys had tried to look around the shower curtain while his sister was bathing, so she instituted a new policy that no one is permitted to be upstairs when someone else is using the bathroom. She stated that the June 2021 referral involved a report that Mother had herself called in. Mother indicated that a new case manager, Anthony Moses (husband of Regina Moses), had recommended that she "call in an allegation describing the nature of abuse that we had experienced by [Father] and to have the investigation reopened" and that she did so.

### 3. Recommendation of the Guardian Ad Litem

{¶ 27} Following the presentation of the evidence, the guardian ad litem set forth her recommendation that, "[d]ue to the complexity of this case," temporary custody be granted to the agency. The guardian ad litem further requested that an attorney be appointed for the children because "they have made both statements, that they do like their placement and that they do wish to return to their mother."

### 4. Decision Granting Predispositional Temporary Custody

{¶ 28} The magistrate granted the agency's motion for predispositional temporary custody, setting forth his findings on the record, in relevant part, as follows:

> The Court does note here that this is a probable cause hearing and does find that there is probable cause for the removal of the children from the home.
>
> It's therefore ordered that predispositional temporary custody is granted.
>
> The Court finds that there has been uninterrupted predispositional [custody] since July 15th of 2021. * * * The Court finds that the continued residence in the home of the mother at this time would be contrary to the children's best interest and welfare.
>
> The Court finds that the children are currently placed in a foster home. They're all in individual homes, therapeutic foster homes.
>
> The Court also finds that the Agency is investigating a relative for possible placement of the children, a paternal aunt.
>
> The Court does find that reasonable efforts have been made, and it's also gonna find that mother has done an awful lot of programming in this.
>
> I still find probable cause for the removal and I question the benefit so far that mother has obtained from all this programming.

Mother and children have been referred and they've been involved in counseling. The children have been involved in the Protect Program. Mother has been referred to AOD and urine screens through Moore Counseling.

She's completed the Moore Counseling, completed a parenting program. We've got a Supportive Visitation Coach through Ohio Guidestone that's just started.

Mother has been referred for a psychological [evaluation] at the Juvenile Court, but the concerns of this Court deal with the medication disbursement to the children properly, the control, the behavior in the home, especially the sexualized behavior, the attending school regularly, and concerns of mother's properly supervised the children.

I'm finding those concerns and this finding based on a probable cause standard. If this was a different standard, I don't know if this Court would make these findings.

{¶ 29} On October 15 and 18, 2021, the magistrate issued written journal entries setting forth his decision. The magistrate also ordered the appointment of separate counsel for the children and that the agency file a case plan within 30 days.

{¶ 30} On October 21, 2021, CCDCFS filed a case plan for the family. The case plan required Mother to (1) complete a psychological evaluation; (2) actively participate in mental-health services and comply with all treatment and medication recommendations; (3) actively participate in parenting classes and follow provider recommendations and (4) demonstrate an ability to meet her children's needs, to appropriately supervise and manage her children's behavior and to keep them safe from future abuse or neglect. The case plan required Father to (1) complete a psychological evaluation and comply with any recommendations, (2) complete a domestic violence/anger management program and (3) complete an alcohol and

drug assessment.  The case plan provided for supervised visitation with the children each week.  The stated permanency goal was reunification with Mother.

{¶ 31} Mother thereafter filed, pro se:  (1) an "affidavit" in which Mother asserted, among other things, that the guardian ad litem had never seen, met or had any conversation with any of the children and "knowingly willfully and deliberately bore false witness, abused her position of trust and * * * purposefully made a false statement concerning the children's interest during an official proceeding," (2) an "Objection to Complaint and Emergency Custody" and "Amendment to Objection" in which Mother claimed that Elmore "has no information that [the] children are neglected and need to be detained"; (3) a "Motion to Set Aside the Magistrate's Order" in which Mother argued that the magistrate's order should be set aside and the children "release[d]" to her care because she had "taken further steps to heighten home security and keep medications secure," she would "continue any recommendations" made as to the children and the children had been "traumatized, horrified, and devastated by [their] foster care experience"; (4) a "Motion to Set Aside[:] Ineffective Assistance of Counsel" in which Mother accused Attorney Amata of "unprofessional conduct," "negligence towards the proceeding," and "preoccupation with background activities" and (5) a "Motion to Remove WOR Gail Elmore and GAL Cynthia Morgan," in which Mother alleged that Elmore and the children's guardian ad litem had made "false statements" and that Elmore had "become abusive to the children."  In support of her filings, Mother set forth

numerous alleged facts that were not in the record from the emergency custody hearing.

{¶ 32} The juvenile court denied Mother's motions, overruled Mother's objections and affirmed, approved and adopted the magistrate's decision granting predispositional temporary custody to the agency.

{¶ 33} On November 9, 2021, Mother (represented by new counsel, Edward Palm ("Attorney Palm")) filed a motion to dismiss the complaint against her because "[s]he has done what the State has asked her to do." Mother asserted that, during the pendency of the prior cases, she had been "working a case plan with the social worker" and "had taken steps to address her issues by completing a behavior modification class and a six-week non-intensive outpatient program for her marijuana use." Mother further asserted that "[t]here does not seem to be any allegations by the State that the children are in any physical danger by being with the Mother" and "assure[d]" the juvenile court that "the children will not be in any sort of danger should the Court dismiss these cases against her and return her children to her." The juvenile court held the motion in abeyance.

**B. Adjudicatory Hearing**

{¶ 34} An adjudicatory hearing was scheduled for January 4, 2022. On January 4, 2022, Father's counsel made an oral motion for continuance. The motion for continuance was granted, and the parties executed a "Waiver of Ninety Day Statutory Time Requirement" (the "90-day waiver"). The 90-day waiver, signed by both Mother and her counsel, stated:

We the undersigned, having been fully advised of our rights under Ohio Law, do hereby knowingly and voluntarily waive the right to have this matter heard within ninety (90) days of filing as required by Ohio Revised Code [Section] 2151.35(B)(1).

We further expressly consent to and request this Court to continue this matter for resolution beyond the ninety (90) day limit in the interests of justice.

We hereby formally waive the right to move this Court to dismiss said Complaint without prejudice for the reason that said matter has not been resolved within the ninety (90) day limit as referenced above.

The adjudicatory hearing was reset for February 7, 2022.

{¶ 35} On February 7, 2022, the magistrate conducted an in-person adjudicatory hearing. Mother was represented by Attorney Palm at the hearing. Prior to commencement of the hearing, Mother made an oral motion requesting that the court conduct an in camera interview of the children. The magistrate granted the request and indicated that it would proceed with adjudication but that it would conduct the in camera interview prior to disposition.

{¶ 36} Marvin Bishop, Tabitha Mazza, J'nae Bennett, Elmore and Ardell Moore testified for CCDCFS at the adjudicatory hearing. Mother testified on her behalf at the hearing.

### 1. Testimony by the Agency's Witnesses

{¶ 37} Bishop, a short-term services worker in the agency's special investigations unit, testified that, in February 2021, while working for the agency's sex abuse unit, he assisted in investigating a sex abuse referral involving an allegation that one of Q.S.'s brothers had touched her vaginal area while she was in the bathtub. Bishop stated that he first reached out to the CCDCFS worker of record,

Elmore and then conducted a forensic interview of each of the children. He stated that Q.S. confirmed the allegation and further disclosed that she had been touched in her vaginal area by Father more than 100 times when she was one or two years old. Q.S. told Bishop that she remembered Father inappropriately touching her when she was one or two years old and that Mother had also told her that Father had "touched [her] there." With respect to his forensic interviews of the other children, Bishop testified that the brother denied touching Q.S. However, all the children stated that they had been touched inappropriately by Father multiple times when they were one or two years old, based on their own memories and what Mother had told them. Bishop indicated that the allegations regarding Father were determined to be unsubstantiated.

{¶ 38} Bishop stated that, based on his experience, he doubted a child could have memories from when he or she was one year old and that, in his view, the children's disclosures about being touched by Father when they were one or two years old were not "credible disclosure[s]." However, he indicated that he did find the children's statements credible when they "all said the same thing about [what] my mom told me." He testified that, when interviewing the children, "there was no detail as to what actually happened" when they were one or two years old; "[i]t was just that they were touched * * * at 1 or 2 years old multiple times." He indicated that he believed the children had been "influenced" or "coached" with "those answers that they provided."

{¶ 39} Mazza, a CCDCFS sex abuse worker, testified that in June 2021, she investigated a report that the children had been sexually abused by Father. As part of her investigation, Mazza interviewed Mother, Father and each of the children.

{¶ 40} Mazza stated that when she arrived at Mother's home, Mother pulled up in a van, asked Mazza who she was and why she was there, told Mazza she had to leave and to get off her property and then began "yelling extremely loud" at her, in the presence of the children, "about the sexual acts that occurred towards her children allegedly by dad * * * like putting his privates in their mouths and things of that nature." She stated that it was "concerning" to the agency that "the kids were around and consistently hearing those details of what [allegedly] happened to them when they were younger."

{¶ 41} Mazza testified that when she interviewed Mother, Mother claimed that Father had sexually abused the children "historically," "when they were younger," but that "[t]here wasn't anything specific" in terms of when this allegedly occurred. Mazza stated that there were no "recent allegations" of abuse and that Father, at that time, had not been visiting the children. She stated that when she spoke with Q.S., Q.S. said that "when she was really young and really little," Father told her that "it was okay to suck his private" and that she remembered this. When Mazza spoke with Hers.S. and Herb.S., the boys informed her that, when they were younger, Father had exposed himself in front of the children, "pulling his private out in front of them" and "swung it around." Mazza indicated that L.S. denied "anything ever sexual occurring to her by anybody."

{¶ 42} Mazza testified that, when she was at Mother's residence, the children were outside "running around," running down the street and sitting in the street, climbing trees, acting "rambunctious" — "[l]ike normal children" — but "unable to really be redirected." She stated that Mother did nothing to attempt to curb this conduct and that Mazza had to direct a child to get out of the street.

{¶ 43} Mazza testified that she spoke with Father who denied the allegations against him and claimed that Mother was asserting false allegations to retaliate against him. Mazza stated that Mother and her oldest son — who was not involved in the case — had reported that Father liked to show that child pornography when he was younger.

{¶ 44} Mazza testified that the allegations of abuse by Father were unsubstantiated by the agency, that there were no safety concerns related to Mother or Father at that time and that she did not believe any "sexual abuses ever occurred with the kids."

{¶ 45} Bennett, a short-term worker in the agency's sex abuse unit, testified that she investigated a report intake allegation received on December 30, 2021 that L.S. had seen Father naked during a virtual visit. Bennett stated that during her investigation, she spoke with L.S. and her foster parent (who was present during the virtual visits) and that they both denied that there had never been any inappropriate interactions with Father or Mother during the virtual visits. Bennett indicated that the report intake allegation was considered unsubstantiated but that she was not

aware of anyone having seen or heard Mother "put[ting] the child up to these allegations."

{¶ 46} Elmore, in large part, reiterated the testimony she provided at the emergency custody hearing. Elmore testified that she first became involved with the family in April 2020 due to allegations of sexualized behavior among the children. She stated that, at that time, Mother and the children were engaged in services through Family Solutions and that the children were also engaged in counseling services through their school. Elmore indicated that when she stepped in, she coordinated services for the family and referred them to the Protect Program to address the children's sexualized behaviors. Elmore stated that paternity had been established for each of the four children and that Father was the established father for each child.

{¶ 47} Elmore testified that, in July 2021, the agency had concerns about Mother's ability to keep the children safe from sexualized behaviors, her ability to ensure their regular attendance at school, her ability to properly administer the children's medication and her use of substances. She indicated that the agency decided to file its initial complaint after a referral was called in to the agency alleging two of the children had been engaged in sexual activities with one another. Elmore stated that when the referral came in, she conferred with Mother and a staffing was conducted, in which Mother participated, to discuss what had occurred. Elmore testified that, during the staffing, the agency raised concerns regarding Mother's ability to keep the children safe from sexualized behaviors in the home and that

Mother responded that she was "overwhelmed" and could not "keep her eyes on the children all of the time." Elmore stated that it was "of great concern" that Mother was not able to prevent the children from engaging in sexualized behaviors with each other.

{¶ 48} Elmore explained that the July 2021 incident was not the first incident of sexualized behavior among the children and that, to address these issues, bedrooms were changed in the home and Mother was to implement "line-of-sight supervision" of the children at all times. She stated that despite these interventions, Mother "struggled with managing her children's [sexual] behaviors," and the children's sexualized behaviors with each other persisted.

{¶ 49} Elmore testified that Mother had alleged that Father had engaged in sexual conduct with his children and had "taught" his children various sexualized behaviors when they were younger. Elmore stated that when she discussed Mother's allegations with the children, the children would always say, "I remember — my mom told me I remember when I was 1 my dad touched me over 100 times." In other words, the children never stated directly that something had been done to them; they stated only "what they had been told or what they thought they believed." Elmore indicated that, in her view, the children did believe they had been sexually abused by Father. Elmore stated that Father had not been engaged in counseling services with the children and that the agency would not be comfortable placing the children in Father's care given the children's belief that Father had sexually abused them and "nothing had happened to potentially alleviate their beliefs on this issue."

{¶ 50} Elmore testified that after she was assigned to the case, she reached out to Father and met with him. Elmore stated that Father told her that he left the home when the children "were about 3-4" and, at the time of their meeting, he had not seen the children in several years due to "some domestic violence that had occurred between the parents" but that he loved his children and wanted to see them. Elmore stated that when she discussed Mother's allegations of sexual abuse with Father, he "kinda broke down," "was in tears" and told her that he never touched his children but that he "did have an issue with pornography," i.e., that he had watched pornography in the presence of the children when they were very young but for which he received treatment. Elmore indicated that she verified with one of the providers that Father had, in fact, received treatment but did not know when the treatment had occurred. Elmore stated that Father became reengaged with the children in August 2021.

{¶ 51} Elmore testified that, "[m]any, many times" Mother discussed inappropriate "sexual things" in the presence of the children and would "[p]retty regularly" state "negative things" about Father in front of the children, e.g., that he was a "pedophile" or a "child molester" and that "he had taught her children these horrible things." Elmore stated that when Mother made such statements, she would attempt to redirect Mother and tell her that she must not say such things in front of the children.

{¶ 52} Elmore testified that she did not know whether Mother had personally observed sexualized behaviors among the children. Elmore indicated that Mother

had reported to her that the children told Mother about these behaviors. Elmore stated that she personally observed an incident in October 2021 in which one of the children pulled another against her and was "rubbing" or "grinding" his body against hers after they got out of the car for a visit. Mother was not present at that time.

{¶ 53} Elmore testified that she had discussed "everyone's concern" regarding the children's ongoing sexualized behaviors with each of the children directly. She stated that Q.S. responded, "I'm not listening to you. I'm gonna do what I want to do." Elmore indicated that she believes Q.S. understands the concern regarding such behaviors but that there was "still more work that needed be done with the service provider." Elmore stated that Q.S. is "very smart" and "very strong-willed" and "will do what she wants to do." Elmore indicated that the agency had not had an opportunity to observe Mother's implementation of parenting skills that could be used to "prevent that from happening."

{¶ 54} With respect to the agency's concerns regarding Mother's substance use, Elmore described a "relatively unannounced home visit" in May 2021, when she called Mother and told Mother that she was in the area and was stopping by. She said that when she arrived at the home, the children were outside, running around unsupervised and that Mother was in the house. When she approached the house, Elmore smelled marijuana and asked Mother if she had just smoked marijuana. Elmore testified that Mother replied that she had been smoking marijuana because she was "very upset" by a conversation she had with the children the prior evening in which "they were discussing the things that their father had done to them."

Elmore stated that Mother did not have a medical marijuana card at that time but obtained one in October 2021. Elmore denied that she had a conversation with Mother regarding obtaining a medical marijuana card and stated that she did not know what medical condition the marijuana was supposed to treat.

{¶ 55} Elmore testified that, following the May 2021 visit, the agency referred Mother to a dual diagnosis program. She indicated that Mother completed the substance abuse portion of that program.

{¶ 56} With respect to Mother's mental health, Elmore stated that Mother had been engaged in mental-health services before the agency filed its initial complaint and that Mother had informed her that she had PTSD. Elmore indicated that she had additional concerns regarding Mother's mental health because when she would tell Mother something, it did not appear that Mother understood what was being said "the way it was put out there" because "[t]he answers [she] would get back would not be related to the question that [she] asked." Elmore stated that she referred Mother for further evaluation based on the clinician's report from the dual diagnosis program but that she did not know the outcome of that evaluation because she was transferred from the case.

{¶ 57} With respect to the children's education, Elmore testified that children were not attending school regularly, that more than 75 percent of school assignments were not completed or submitted and that, due to missed classes, the children had been held back. She stated that each of the children had some form of

mental-health issue, including PTSD, oppositional defiant disorder or conduct disorder.

{¶ 58} Elmore testified that Mother and Father had been having separate weekly in-person visits with the children at the Jane Edna Hunter Building and that the visits usually involved all four children. Elmore indicated that the parents had separate visits due to the prior domestic violence issue and the fact that Mother had stated she did not feel safe in the presence of Father. Elmore stated that during visits with Mother, "the children were very active, difficult to redirect, defiant, oppositional, writing on tables," "running around, sometimes hitting each other, throwing backpacks over the banister, sliding down banisters." Elmore stated that she was concerned for the safety of the children during visits because the children were "so active" and "very hard to redirect" and indicated that Mother was not effective in her efforts to redirect the children. Elmore indicated that she, a coworker and at least two other individuals from Ohio Guidestone would supervise each visit. Elmore stated that the children were "a little different" during their visits with Father, i.e., they were "not as active and running around," Father was able to redirect the children "a little bit better" and they listened to Father "a little bit better."

{¶ 59} Elmore testified that, when interacting with Mother during visits, she "could not have a conversation really with [Mother] about case planning, progresses, things like that" because Mother would accuse her of "hitting her or * * * saying derogatory things."

{¶ 60} Elmore stated that Mother had two older children who had been removed from her custody due to mental-health issues and substance abuse. She indicated that the agency was granted permanent custody of one of the children and that the other child was placed in the legal custody of someone other than Mother.

{¶ 61} Moore, a clinical supervisor at Ohio Guidestone and a licensed independent social worker and independent chemical dependency counselor, became involved with the family after the children were removed from Mother's home in July 2021. She stated that the children received services through Ohio Guidestone's Protect Program, "a treatment program that focuses on sexual[ly] inappropriate behaviors amongst juveniles."

{¶ 62} Moore testified that she did not provide services to Mother directly, but rather, supervised a team that provided Protect services for the family. Moore stated that, in that role, she spoke with Mother three times on the phone and met with her once in person. She indicated that Mother was "understandably" "tearful" and "overwhelmed with the whole process of the kids being removed." Moore explained she had concerns regarding Mother's "reasoning or reality" regarding the sexualized behaviors the children were exhibiting and recommended that Mother engage in mental-health services. She stated that there had been "six, seven calls within a year to DCFS about inappropriate behavior" and that she "was wondering whether [Mother] had the skills needed to continue to keep the kids safe."

## 2. Mother's Testimony

{¶ 63} Mother testified that Q.S., Herb.S., Hers.S. and L.S. had been previously involved with the agency in 2016 and 2019. She stated that in March 2020, two workers from the CCDCFS sex abuse unit had sought to "close the case." Mother indicated that she had, at that time, asked the agency to work with Cleveland Heights police to apprehend Father and protect the family from "[Father's] stalking and other broken people that call into the hotline with false allegations," but the agency failed to do so.

{¶ 64} Mother claimed that the children were "taken away" from her after the children were "assaulted by a case manager and that manager phoned in a false allegation to the hotline." Mother stated that, at that time, the children were receiving counseling at Beech Brook because the children "definitely were having some over-sexualized behaviors" and had "already informed the teachers at their school that they had been sexually abused by their father" and she "wanted to ensure the success of [the] children in the future." Mother indicated that she had also had "regular bouts" of "intensive therapy" "here and there," to address issues related to her experiences as a victim of domestic violence and a "victim of abuse." Mother stated that she was not engaged in mental-health counseling in July 2021, when the initial complaint was filed, because her therapist had just resigned her position but that she thereafter reengaged in counseling services with Moore Consulting and Ohio Guidestone. Mother stated that the only "mental issue" she has is PTSD.

**{¶ 65}** Mother testified that Father was arrested in August 2015 and that he had, thereafter, "made attempts" to return to the household, but she obtained a restraining order against him. She further testified that Father had "cancelled his [c]hild [s]upport [o]rder" in 2014 such that she had been the "sole parent" and "sole provider" of the children "pretty much from 2015-2021."

**{¶ 66}** Mother admitted that she used marijuana in May 2021 before obtaining a medical marijuana card but claimed that it was a "one-time incident." She stated that, because there was no active court case at that time, she was under no obligation to allow Elmore into her home, but did so, knowing that she had just smoked marijuana.

**{¶ 67}** Although Mother admitted that she had used and tested positive for marijuana, she denied that she had a substance-abuse problem and stated that she had completed a substance-abuse program through Moore Counseling. She stated that she obtained a medical marijuana card from a doctor at Ohiomarijuanacard.com at Elmore's "urging" and that she informed the doctor that she needed a medical marijuana card for PTSD and because "it was recommended by my caseworker that I get one." Mother testified she continues to smoke marijuana "[j]ust as needed per my doctor."

**{¶ 68}** Mother testified that she has taken two parenting classes, claims that she has the necessary parenting skills to parent her children and stated that Elmore and others had "praised" her parenting skills. Mother denied that the children were

in any danger living with her. She stated that she does not hit her children and that she is "very active with" and "encourage[s]" her children.

{¶ 69} Mother denied that she had "coached" the children "to say what they need to say to social workers and people like that" about abuse by Father. She stated that the children told her about their Father's behavior and that the children also reported the behavior to their counselors at Beech Brook, who then reported the sexual abuse through the agency hotline. She indicated that she did not believe L.S. remembered the abuse that allegedly occurred but that Herb.S. and Hers.S. did. Mother stated that although Father left the home before 2015, the abuse continued after 2015 because "[o]ther people let [Father] have access to the children," including an aunt, whom she had trusted at that time.

{¶ 70} Mother testified that she had witnessed Father abusing the children sometime prior to 2015, before he moved out. She stated that she reported the abuse to police at the time and "continue[s] to report it." Mother denied that she ever told the children that Father had molested them but stated, "[M]e and my children have been in counseling and therapy for quite some time * * * . We've had quite a bit of uncomfortable conversations to promote healing * * * [w]ith the therapist and without." Mother indicated that she had personally witnessed the children demonstrating sexualized behaviors, including exposing themselves in public and making videos. When asked whether she agreed the children needed more supervision to make sure they do not act out sexually, Mother disagreed and stated that "they need more therapy * * *[,] more family therapy, more counseling. We

need to work together and have these difficult, uncomfortable conversations, and that's how you get to the path of healing, by working through it."

{¶ 71} Mother denied that she ever told the agency that she could not supervise the children. She stated that she believed she could supervise the children at all times and that she had a security system in the home with cameras in every room.

### 3. Adjudication Decision

{¶ 72} On February 8, 2022, the magistrate issued his decision, finding that the allegations of the complaint had been proven by clear and convincing evidence and adjudicating the children to be neglected and dependent. On February 24, 2022, Mother filed, pro se, objections to the magistrate's decision, listing various facts that she contended had been established (or had not been established) through testimony at the hearing and arguing that the evidence presented did not support the magistrate's findings of neglect and dependency. On February 25, 2022, the juvenile court affirmed, approved and adopted the magistrate's decision.

### C. In Camera Interview

{¶ 73} On March 8, 2022, the magistrate conducted an in camera interview of the four children. The children's guardian ad litem and the children's attorney were present for the in camera interview.

### D. Dispositional Hearing

{¶ 74} The juvenile court conducted a dispositional hearing on March 18, 2022. Mother was represented by Attorney Palm at the dispositional hearing. At

the outset of the hearing, Attorney Palm requested a continuance based on "some things" Mother had told him the day of the hearing that he thought "should be looked into a little bit further." A short recess was taken to discuss the issue. No further information was provided on the record regarding the issue and when the proceeding was back on the record, the hearing went forward. Per the parties' agreement, the evidence presented at the adjudicatory hearing was incorporated into the record of the dispositional hearing. Michael Bokmiller and Sierra Whatley offered further testimony on the agency's behalf, Teniel Cleveland offered further testimony on Mother's behalf and the guardian ad litem presented her recommendation at the dispositional hearing. Father stipulated to the disposition of temporary custody.

{¶ 75} At the time of the dispositional hearing, L.S. was eight years old, Herb.S. and Hers.S. were nine years old and Q.S. was ten years old.

### 1. Testimony by the Agency's Witnesses

{¶ 76} Bokmiller, a supervisor in the agency's sex abuse unit, testified that his unit investigated a referral, received on December 31, 2021, alleging that L.S. had told Mother that she had seen Father naked during a virtual visit. Bokmiller stated that Bennett investigated the allegation and that she spoke with L.S. and L.S.'s foster parent regarding the alleged incident and the foster parents for the other children to see if they had witnessed anything similar. He indicated that the allegation was determined to be unsubstantiated.

{¶ 77} Bokmiller testified that L.S. denied the allegation, that Q.S.'s foster parent told Bennett that Q.S. did not have virtual visits (only telephone calls) with Father, that Hers.S.' foster parent told Bennett that Hers.S. did not have contact with Father at that time and that Herb.S.'s foster parent told Bennett that she overheard Mother telling Herb.S. that Father had been naked during a call with his sister and that Herb.S. should not tell anyone about it.

{¶ 78} Whatley, a CCDCFS case worker, testified that she was assigned to the case in December 2021. She stated that the case plan objectives for Father included completing a mental-health assessment and an anger management assessment. She testified to Father's completion of case plan services, but stated there is a "strained relationship" between Father and the children due to Father's limited contact with the children after he left the family home in 2015 and the fact that "[s]ome of the kids do believe something did happen to them." She indicated that the agency wanted to see Father repair his relationship with the children before considering placing any of the children with him.

{¶ 79} Whatley testified that the current case plan objectives for Mother involved mental-health services and parenting services. Whatley indicated that before she was assigned to the case, the case plan also included substance-abuse services, but that Mother had completed substance-abuse programming and such services were no longer part of the case plan. Whatley could not say whether substance use was a continuing concern for Mother. She noted that, although Mother has a medical marijuana card, it had been reported that Mother was

smoking marijuana during one of her virtual counseling sessions. Whatley did not know what condition the medical marijuana was prescribed to treat.

{¶ 80} With respect to the parenting component of Mother's case plan, Whatley testified that Mother had completed a parenting program through Ohio Guidestone on January 31, 2022, but that the agency was concerned "whether she benefitted from it or not."

{¶ 81} Whatley testified that when COVID numbers increased in December 2021, the Jane Edna Hunter Social Services building, where supervised were conducted, was closed. Accordingly, in-person supervised visits were suspended until February 1, 2022. During that time, phone visits or video visits were conducted.

{¶ 82} Whatley testified that, during virtual visits and telephone calls with Mother,[2] Mother would "sometimes say[] inappropriate things to the children that [would] really get the children stressed out" or "make[] them uncomfortable" and would yell at the case worker or foster parents. She provided several examples of this conduct. She stated that, during calls with Herb.S., Mother told Herb.S. that L.S. had witnessed Father on a virtual call naked and that "he needs to tell everybody what his father did to him," causing Herb.S. to go to school "stressed out saying that he was really overwhelmed by the news that he got from his mother." During calls with L.S., Mother reportedly told L.S. "it's ok to be mean" and that she "[didn't] have

---

[2] Whatley stated that Q.S. and L.S. also had virtual visits or calls with Father during this time period but that the boys said Mother told them they were not supposed to talk to Father and they "didn't want to call their father."

to like the foster parents," following which L.S. "would kind of be mean to the other kids in the home and other kids in school." During a virtual Zoom visit with Hers.S., Mother claimed that the pharmacy had contacted her and told her that Hers.S.' foster parent was not giving him his medication. When Hers.S.' foster parent, who had overheard Mother, contradicted her, Mother began to yell at the foster father. Whatley, who was present for the virtual visit, stated that she redirected Mother and that Mother calmed down but that, following that visit, Hers.S. was "very upset" and stated "he wanted to run away."

{¶ 83} Whatley indicated that the most concerning incident, however, involved a call Mother had with Q.S. on January 31, 2022. During the call, Mother reportedly told Q.S. that "she needs to tell everybody how her father's penis was in her mouth" and "kept saying it to the point that [Q.S.] got so uncomfortable that she hung up the phone and didn't want to talk anymore."

{¶ 84} Whatley stated that, following the call, she raised the inappropriate nature of Mother's communications with Mother "to try to kind of reason with her to see why it wasn't appropriate." Whatley indicated that "there was just no reason[ing]" with Mother and that Mother said that "uncomfortable conversations * * * are part of healing" and that "she's gonna keep telling her daughter to talk about the penises that was in her mouth."

{¶ 85} Whatley explained the agency's ongoing concern regarding Mother's parenting skills as follows:

It's one thing to complete a service, you know, attend every course, every class, but are you benefiting because we bring to her attention that these conversations make her children uncomfortable or stressed out and so we try to redirect her, and I can't redirect her.

She told me to only speak when spoken to. So yes, she's taken it, but is it fair to keep retraumatizing the kids with the same thing? * * * Those things, the trauma or anything the kids been going through, it should be unpacked in a therapeutic manner, not yelling and saying tell everybody how a penis was in your mouth. That's just not appropriate.

{¶ 86} Whatley testified that when she was attempting to speak with Mother regarding her inappropriate communications with her children, Mother was "more focused" on getting the agency to assist the police in apprehending Father than listening to Whatley's concerns. Whatley stated that she was not aware of any open police investigation involving Father.

{¶ 87} Following the January 31, 2022 incident, the agency made an emergency amendment to the case plan suspending all communications between Mother and the children. Whatley stated that before the agency would consider restarting visits with Mother, it would need to see a change in behavior, i.e., an understanding that visitation is a time to interact with the children and ask them about things they are doing, not using the visit to talk about Father. She stated that if in-person visits were to resume, the visits would not only be supervised by Whatley, but also representatives from Ohio Guidestone and supportive services, who would assist with parenting techniques and appropriate redirection and discipline.

{¶ 88} With respect to the mental-health services component of Mother's case plan, Whatley testified that Mother had been receiving weekly individual

counseling through Ohio Guidestone but that her therapist believed Mother needed more intensive therapy and services and had referred Mother to Ohio Guidestone's Act Team. Whatley indicated that the therapist had made "clinical findings" of displaying delusions, grandiose delusions, schizoaffective paranoia and irrational thought and thinking. Whatley stated that Mother had not been prescribed any medication because Mother told her therapist she would not take medication.

{¶ 89} Whatley testified that the children were, at that time, in four separate foster homes. She indicated that the children have phone calls with each other and that two of the children see each other frequently because their foster parents are friends. She stated that all the children receive individual counseling and that since they have been in agency custody, they have progressed in their services "a lot." She indicated that the three younger children had been recently "stepped down" from the Protect Program to "just regular counseling" and that none of the children had displayed any sexualized behaviors while in their foster placements. Whatley noted that all the children have IEPs and were making progress in school.

{¶ 90} Whatley testified that she had not yet visited Mother's home but that the prior case worker, Elmore, had visited the home and found it to be appropriate. Whatley stated that she was instructed not to go to Mother's home "due to the threats [Mother] had made toward the previous worker and myself." Whatley indicated that she had filed a police report following threats Mother made in a voicemail message.

{¶ 91} Whatley stated that the agency did not believe Mother was yet in a position to be reunified with her children and that it would like to see Mother participate in the Act Team therapy "to address whatever it is that she has going on" and improve her interactions with the children to have "more positive visits," "more positive communications" with the children before they were reunified.

{¶ 92} At the conclusion of her testimony, the magistrate asked Whatley to further explain what the agency is "looking for" to restart visitations with Mother. Whatley responded:

> [H]er therapist said she has an irrational thought process. Also her therapist shared that [Mother] don't take any accountability.
>
> So some accountability or even being able to be redirected to understand why these conversations in this manner is not appropriate or helpful for the children.
>
> If the children are reporting that they're stressed out or they're uncomfortable, then maybe this is not a good idea. Regardless if you believe that uncomfortable conversations is a part of healing, they're not healing when they're going to school and crying and reporting that they're stressed out. That's not healing, and it's not helpful to the children.
>
> Like we have them in all this counseling and every time they [hear] the same thing, we're sending them back * * * to unpack everything that they just heard from a visit or heard from a phone call. So we want them to progress. So maybe they don't need counseling anymore. To a point that if something like this is ever mentioned, they don't feel like they have to go to school crying or they're saying that they're stressed out or comfortable.

## 2. Testimony by Mother's Witness

{¶ 93} Cleveland testified that she and Mother "kinda grew up together" and that Mother was "like a sister" to her. She stated that, in her view, although Mother had "made some mistakes" when she was younger, Mother had "become an outstanding parent." Cleveland stated that the children were "good" when they were in Mother's custody except "they were exhibiting behaviors of sexual abuse in the community" and "speaking explicitly about things that had happened to them." She stated that, when this occurred, Mother "started reaching out to different counseling services trying to get some help" and that "she was always doing everything she could to get her children help."

{¶ 94} Cleveland testified that Mother had an appropriate home for the children, that she had never seen Mother abuse the children and that Mother made sure the children attended school.

## 3. Recommendation of the Guardian Ad Litem

{¶ 95} On December 22, 2021, the children's guardian ad litem filed a written report recommending that temporary custody of the children be granted to the agency to "allow[] further therapy/educational counseling for each child as well as therapy/educational counseling for both parents," which could be "followed by family counseling." After the agency presented its closing argument, the children's guardian ad litem also stated her recommendation on the record at the temporary custody hearing.

{¶ 96} The children's guardian ad litem explained that her recommendation was based on five considerations: (1) to give Mother time to participate in the Act Team therapeutic services, (2) to give Father time to repair his relationship and increase his visitation with the children, (3) to give each child time to increase their therapeutic services, (4) to give Mother time to improve her parenting skills and (5) because each child is doing very well in placement. She noted, however, that all four children were in Level 4 placements and that it was "quite unusual" for all children to be placed separately.

### 4. Decision Granting Temporary Custody to the Agency

{¶ 97} After hearing brief closing arguments from Mother's counsel and counsel for the children and stating that he would take the children's "wishes" as expressed during the in camera interview "into consideration," the magistrate granted temporary custody of the children to the agency. The magistrate found that the agency had made reasonable efforts to eliminate the continued removal of the children from the home or make it possible for the children to return home and that returning to Mother's custody would, at that time, be contrary to the children's best interest. The magistrate also made the following specific findings:

> The specific findings of this Court is that the father has been engaged in mental health and anger management and he's completed through Moore Counseling, has appropriate counseling, but he has to re-establish his relationship with the children.

> Mother has completed her parenting at Ohio Guidestone, although there are concerns of her benefiting from that counseling. Mental health, she's engaged at Ohio Guidestone. Visitation was suspended due to inappropriate comments made to the children. Substance

abuse. There was a completed AOD assessment. The children are involved in a Protect Program and have individual counseling. They are progressing in services. * * * The Agency shall ensure that the children are enrolled in school and ensure that the children attend school on a daily basis with no unexcused absences, which I believe is occurring.

{¶ 98} The magistrate approved the amended case plan and indicated that he would not be lifting the suspension of visits between Mother and the children at that time. He ordered that (1) "neither parent is to make any derogatory remarks about each other" and (2) when Mother's visitation is reinstated, she "is not to have any discussions with these children concerning any sexual conduct," finding that "that is extremely destructive to these children at this time." On March 21, 2022, the magistrate filed written decisions setting forth his findings.

{¶ 99} That same day, Attorney Palm filed a motion to withdraw his representation of Mother on the ground that "[t]he relationship between client and counsel has deteriorated to the extent that counsel can no longer represent his client." The juvenile court granted the motion, finding that "good cause exists for the request." The order granting the motion further stated that Mother was responsible for retaining counsel for future hearings, that she could complete a financial disclosure form if she believed she would qualify for court-appointed counsel and that failure to do so would be "deemed as a waiver of counsel."

{¶ 100} On March 22, 2022, Mother filed, pro se, an "objection/motion to set aside the magistrate's order," asserting that Whatley was "a liar" for claiming that Mother had threatened her and attaching a copy of a "call for service report" from

Chagrin Valley Dispatch dated February 2, 2022 that had not been introduced into evidence at the hearing. The juvenile court denied Mother's motion/objection and affirmed, approved and adopted the magistrate's March 21, 2022 decision granting temporary custody of the children to the agency.

{¶ 101} Mother appealed, raising the following nine assignments of error for review:

> The trial court erred and abused its discretion when it did not cite in writing the emergency that caused the removal of four beautiful well-cared-for children from an excellent and stable home under case number 21906069-72.

> The court abused its discretion when it failed to cite in writing the end of the emergency and reunification orders under case number 21906069-72 and allowed the Agency to refile under a different statute case 21909146-9.

> The trial court erred erroneously and abused its discretion when it cited reasonable efforts had been made to prevent removal of the children and then cited the services referred after removal as unsuccessful.

> The trial court erred erroneously and severely abused its discretion when it claimed the "best interest" of the children is to remain incarcerated in the system.

> The court did abuse its discretion when it overruled the mother's objections and motions including the motion for ineffective assistance of counsel and to remove perjurers.

> The trial court erred when it forced the mother to be repeatedly assisted by ineffective counsel. The court erred and knew the Mother hired counsel who began to collude with it against the best interest of the children.

> The trial court erred erroneously when it made rulings based on perjury.

The trial court erred erroneously in due process when Mother's attorney Ed Palm scared the Mother and lied to her regarding a 90 day waiver based on lies attorney Jean Brandt had told it.

The trial court was prejudiced and in error when it heard the children['s] allegations of abuse by their father in chambers and disregarded them.

{¶ 102} For ease of discussion, we address Mother's assignments of error out of order and together where appropriate.

## II. Law and Analysis

{¶ 103} As an initial matter, we note that Mother's brief contains no citations to the record, minimal citations to supporting legal authority and no separate argument with respect to her seventh assignment of error. In addition, many of Mother's arguments are convoluted and, at times, difficult to follow. As this court has previously observed:

> "We recognize that a pro se litigant may face certain difficulties when choosing to represent oneself. Although a pro se litigant may be afforded reasonable latitude, there are limits to a court's leniency. *Henderson v. Henderson*, 11th Dist. Geauga No. 2012-G-3118, 2013-Ohio-2820, ¶ 22. Pro se litigants are presumed to have knowledge of the law and legal procedures, and are held to the same standard as litigants who are represented by counsel. *In re Application of Black Fork Wind Energy, L.L.C.*, 138 Ohio St.3d 43, 2013-Ohio-5478, 3 N.E.3d 173, ¶ 22."

*In re C.T-T.*, 8th Dist. Cuyahoga No. 107059, 2019-Ohio-3362, ¶ 9, quoting *Saeed v. Greater Cleveland Regional Transit Auth.*, 8th Dist. Cuyahoga No. 104617, 2017-Ohio-935, ¶ 7. An appellate court "may disregard" an assignment of error presented for review if the appellant fails to identify in the record the error on which the assignment of error is based, fails to cite to any legal authority in support of an

assignment of error or fails to argue an assignment of error separately in the brief, as required under App.R. 16(A)(7). App.R. 12(A)(2); *Story v. Story*, 8th Dist. Cuyahoga No. 109850, 2021-Ohio-2439, ¶ 29. "An appellate court is 'not obliged to construct or develop arguments' to support an appellant's assignment of error and 'will not "guess at undeveloped claims on appeal."'" *Story* at ¶ 30, quoting *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 56 (8th Dist.), quoting *McPherson v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit No. 21499, 2003-Ohio-7190, ¶ 31. "'If an argument exists that can support [an] assigned error, it is not this court's duty to root it out.'" *Strauss v. Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, ¶ 72, quoting *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and 18673, 1998 Ohio App. LEXIS 2028, 22 (May 6, 1998); *see also Rodriguez v. Rodriguez*, Cuyahoga App. No. 91412, 2009-Ohio-3456, ¶ 7 ("[I]t is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error.").

{¶ 104} Nevertheless, because cases are best decided on their merits, although we disregard and overrule Mother's seventh assignment of error due to the lack of any separate argument, we employ our discretion to address Mother's remaining assignments of error, to the extent we are able to discern them.

{¶ 105} We also note that, throughout her appellate brief, Mother has referenced various alleged facts that are not part of the record in this appeal. In reviewing an appellant's claims of error, an appellate court is limited to the facts and evidence set forth in the record of appeal and cannot consider facts outside that

record. *See* App.R. 9; App.R. 12(A)(1)(b); *In re K.K.*, 4th Dist. Highland Nos. 21CA1 and 21CA2, 2021-Ohio-3338, ¶ 16, fn. 3 ("It is simply not permissible on direct appeal to consider matters outside of the record."); *Morgan v. Eads*, 104 Ohio St.3d 142, 2004-Ohio-6110, 818 N.E.2d 1157, ¶ 13 ("[A] bedrock principle of appellate practice in Ohio is that an appeals court is limited to the record of the proceedings."); *Herron v. Herron*, 9th Dist. Summit No. 29683, 2021-Ohio-2223, ¶ 19 ("'Matters outside the record cannot be used to demonstrate error,'"), quoting *In re J.C.*, 186 Ohio App.3d 243, 2010-Ohio-637, 927 N.E.2d 69, ¶ 15 (9th Dist.). Accordingly, this court's review is limited to the record before us. In considering Mother's remaining assignments of error, we limit our review to the facts and evidence in the appellate record.

## A. Predispositional Temporary Custody

{¶ 106} In her first and second assignments of error, Mother challenges the juvenile court's decision granting predispositional temporary custody of the children to the agency.[3] Mother asserts that the juvenile court "erred and abused its discretion" in granting the agency's motion for predispositional temporary custody because it "did not cite in writing the emergency [that] caused the removal of the children," did not "make a plan to return the children," "did not weigh all facts" and

---

[3] Mother expressly references the case numbers of the prior cases (Cuyahoga J.C. Nos. AD21906069-AD21906072) in her first two assignments of error. As such, it is not entirely clear whether Mother is challenging the juvenile court's decision to grant emergency custody of the children to the agency in the cases that are the subject of this appeal or in the prior cases. Because the juvenile court's decision in the prior cases is outside the scope of this appeal, we address only the juvenile court's decision in the cases that are the subject of this appeal.

"overlooked the truth and the actual circumstance which prompted the CCDCFS to set a staffing and remove the children" — which Mother contends was "the assault by the case manager Regina Moses and her false allegation to the hotline."

{¶ 107} The juvenile court's orders granting predispositional temporary custody of the children to the agency were interim, temporary orders. As such, the agency argues that "[i]nsofar as [Mother] seeks to challenge the propriety of the pre-dispositional temporary custody orders made in these matters, this issue is moot" because "these orders have been superseded by the trial court's final dispositional orders."

{¶ 108} We note that this court has stated that assignments of error related to temporary custody orders "are rendered moot by the final determination of custody." *Barry v. Rolfe*, 8th Dist. Cuyahoga Nos. 88459, 88460, 88676, 88680-86, and 88908-11, 2008-Ohio-3131, ¶ 39; *cf. V.C. v. O.C.*, 8th Dist. Cuyahoga No. 109988, 2021-Ohio-1491, ¶ 46; *In re C.T-T.*, 8th Dist. Cuyahoga No. 107059, 2019-Ohio-3362, ¶ 10; *see also O'Conner v. Stires*, 12th Dist. Fayette No. CA2017-04-008, 2017-Ohio-8929, ¶ 12 (even if appellate court were to find juvenile court had erred in granting temporary custody to agency, such error had no bearing on the ultimate outcome of the case because the temporary custody order had been superseded by the juvenile court's final custody determination). However, we also note that specific requirements must be met before a child can be properly removed from his or her home and placed in the emergency custody of the agency, *see, e.g.,* R.C. 2151.31 — challenges to which might not necessarily be mooted by subsequent

custody orders. We need not resolve that issue here because even if we were to consider the merits of Mother's first and second assignments of error, we would find those assignments of error meritless. *See In re G.G.*, 8th Dist. Cuyahoga Nos. 111322 and 111324, 2022-Ohio-3821, ¶ 35-40 (considering whether the record contained sufficient evidence for the juvenile court's predispositional temporary custody orders in appeal of judgments granting temporary custody of the children to CCDCFS).

{¶ 109} In this case, following a hearing, the juvenile court determined that there was probable cause for the continued removal of the children from Mother's home and that return of the children to Mother's home would, at that time, be "contrary to the [children's] best interest and welfare." In its written journal entries, the juvenile court identified the specific "concerns" that led to its determination that granting predispositional temporary custody to the agency (i.e., continuing predispositional temporary custody from the prior cases) was in the children's best interest, i.e., "concerns" regarding (1) Mother's proper disbursement of medication to the children, (2) Mother's proper supervision of the children and ability to "control" their sexualized behaviors in the home and (3) the children's failure to attend school regularly.

{¶ 110} The juvenile court further found that the agency had made reasonable efforts to prevent the removal of the children from the home, to eliminate the continued removal of the children from the home or to make it possible for the children to return home based on (1) referrals of Mother and the children for

counseling, (2) the children's involvement in the Protect Program and (3) referrals for Mother for a parenting program, an alcohol and drug assessment and related programming through Moore Counseling, a supportive visitation coach and a psychological evaluation at the court's diagnostic clinic.

{¶ 111} As detailed above, each of these findings was supported by ample competent, credible evidence presented at the emergency custody hearing and the recommendation of the children's guardian ad litem. The agency presented evidence — corroborated by Mother's testimony — that despite her knowledge of prior incidents of sexual behavior among the children, Mother had failed to adequately supervise the children, resulting in the children engaging in continued incidents of sexualized behaviors with each other in Mother's home. When asked why she failed had implement the line-of-sight supervision regarding which she had been instructed, Mother indicated that she could not watch the children "all the time." The agency also presented evidence of Mother's failure to properly administer medication to the children, issues with the children's regular school attendance and Mother's nonprescription marijuana use at home, as a coping mechanism, when the children were under her care, without another caregiver present.

{¶ 112} Mother has not shown that the juvenile court abused its discretion or otherwise erred in granting predispositional temporary custody to the agency. Simply because the juvenile court ruled against Mother does not mean it "did not

weigh all facts" or "overlooked the truth." We overrule Mother's first two assignments of error.

## B. 90-Day Waiver

{¶ 113} In her eighth assignment of error, Mother contends that she was denied due process because (1) Father's attorney "lied to the court" and said that Father could not appear for the January 4, 2022 temporary custody hearing because he had COVID-19 (when, in fact, he was "at work" and had "purposefully skipped the hearing") and (2) Attorney Palm "scared" Mother into signing the 90-day waiver (by telling her that "if she did not sign it, the county would refile and it would be much longer than 90 days before she could get children back") such that she signed the waiver "under duress."

{¶ 114} Mother's written waiver, in which she "knowingly and voluntarily waived her right to have the case heard within 90 days as required by R.C. 2151.35(B)(1)," was signed by Mother and her counsel and filed with the juvenile court. There is nothing in the record to support Mother's claim that Father's counsel "lied to the court" or that Mother executed the 90-day waiver under duress. We overrule Mother's eighth assignment of error.

## C. Temporary Custody Determination

{¶ 115} Mother's third, fourth, fifth and ninth assignments of error relate to the juvenile court's decision granting temporary custody of the children to the agency. Mother challenges the juvenile court's findings that (1) reasonable efforts were made to prevent the removal of the children from the home, to eliminate the

continued removal of the children from the home or to make it possible for the children to return home, (2) the services provided to the family were "unsuccessful" and (3) granting temporary custody to the agency was in the children's best interest. Mother also contends that, in granting temporary custody to the agency, the juvenile court improperly "disregarded" the children's "allegations of abuse by their father" as "reported to the magistrate" during the in camera interview and that the juvenile court's decision was improperly based on "perjury" by "county workers," the children's guardian ad litem and Father's attorney.

{¶ 116} In this case, the juvenile court granted temporary custody of the children to the agency after the children were adjudicated neglected and dependent.[4] If a child has been adjudicated neglected or dependent, the juvenile court may order the child placed in the temporary custody of CCDCFS if it finds such a disposition to be in the best interest of the child based on a preponderance of the evidence. R.C. 2151.353(A)(2)(a); *In re K.E.*, 8th Dist. Cuyahoga No. 111443, 2022-Ohio-3333, ¶ 22; *In re A.S.*, 8th Dist. Cuyahoga No. 105651, 2018-Ohio-1085, ¶ 18.

{¶ 117} When choosing among the dispositional alternatives authorized by R.C. 2151.353(A), "the juvenile court is to be mindful of the stated purpose of R.C. Chapter 2151, which is to provide for the 'care, protection, and mental and physical development of children.'" *In re G.G.*, 2022-Ohio-3821, at ¶ 44, quoting R.C.

---

[4] Based on our reading of Mother's appellate brief, Mother does not specifically challenge the juvenile court's findings that the children were neglected and dependent on appeal. Accordingly, we do not further address those findings here.

2151.01(A). "Whenever possible, the child is to remain in a family environment and the child should be separated from the child's parents only when necessary for the child's welfare." *In re G.G.* at ¶ 44, citing R.C. 2151.01(A) and *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 29. However, the court's primary concern always remains the best interest of the child. *In re Ka.C.*, 8th Dist. Cuyahoga Nos. 102000, 102002, 102005, and 102006, 2015-Ohio-1158, ¶ 19, citing *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 3.

{¶ 118} On appeal, we examine the record to determine whether the juvenile court's decision is supported by competent, credible evidence that satisfies the required standard of proof. "An award of temporary custody to a public or private children's services agency is substantially different from an award of permanent custody, where parental rights are terminated." *In re Ka.C.* at ¶ 20. Although the parents lose temporary custody of the child, they "retain[] residual parental rights, privileges, and responsibilities." *Id.* Further, the parents' right to regain custody of the child is not permanently foreclosed. *In re M.J.M.*, 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674, ¶ 12. "Because a granting of temporary custody does not divest parents of their fundamental parental rights, the parent can continue to fight for their children." *In re Lu.M-R*, 10th Dist. Franklin No. 21AP-681, 2022-Ohio-4779, ¶ 25. For this reason, the less restrictive "preponderance of the evidence" standard is applied in temporary custody cases as opposed to the "clear and convincing evidence" standard applied in permanent custody cases. *In re G.G.* at ¶ 47-48; *In re Ka.C.* at ¶ 20. "'Preponderance of the evidence' means 'evidence that

is more probable, more persuasive, or of greater probative value.'" *In re C.V.M.*, 8th Dist. Cuyahoga No. 98340, 2012-Ohio-5514, ¶ 7, quoting *In re D.P.*, 10th Dist. Franklin No. 05AP-117, 2005-Ohio-5097, ¶ 52; *In re G.G.* at ¶ 48.

{¶ 119} Although an award of temporary custody to a children's services agency must be supported by the preponderance of the evidence, the juvenile court "'has substantial discretion in weighing the considerations involved in making the determination regarding a child's best interest.'" *In re G.G.,* 2022-Ohio-3821, at ¶ 45, quoting *In re S.M., C.M., & D.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710 at ¶ 4. There is no specific test or set of criteria that must be applied to determine what is in a child's best interest when considering temporary custody as a dispositional alternative following an adjudication of abuse, neglect or dependency. *In re G.G.,* 9th Dist. Summit No. 29952, 2022-Ohio-1654, ¶ 33. Nevertheless, courts have held that the best-interest factors set forth in R.C. 2151.414(D)(1) and/or 3109.04(F)(1) — to the extent they are relevant — may be instructive in making that determination. *See, e.g., id.* We review a juvenile court's best-interest analysis for an abuse of discretion. *See, e.g.,* *In re G.G.,* 2022-Ohio-3821, at ¶ 46.

{¶ 120} Following a thorough review of the record, we conclude that the juvenile court's decision to award temporary custody to CCDCFS was supported by the preponderance of the evidence and was not against the manifest weight of the evidence and that the juvenile court did not abuse its discretion in determining that it was in the children's best interest to grant temporary custody of the children to

the agency. There is no evidence in the record to support Mother's claim that the juvenile court relied on "perjured" testimony in deciding to grant temporary custody of the children to the agency. Ample competent, credible evidence in the record supports the juvenile court's decision.

{¶ 121} Here, the agency presented evidence that, although Mother had engaged in a number of services, including substance-abuse programming, parenting classes and individual and family counseling, Mother had not yet shown that she had sufficiently benefited from those services to resolve the concerns that led to the children being removed from the home. Evidence was presented that Mother continued to have difficulty controlling her children's behavior during supervised visits and continued to have inappropriate conversations with her children regarding the children's alleged sexual abuse by Father that caused the children to cry and feel "uncomfortable" and "stressed." Whatley testified that although the agency had discussed Mother's inappropriate communications with Mother and had attempted to reason with and redirect Mother towards more appropriate topics of conversation, Mother refused to acknowledge the negative impact her communications were having on the children or to alter her behavior. Indeed, as of the date of the hearing, visitation between Mother and the children had been suspended due to Mother's continued inappropriate communications with the children and insistence, despite agency efforts to reason with and redirect Mother, that "uncomfortable conversations * * * are part of healing" and that "she's gonna keep telling [Q.S.] to talk about the penises that was in her mouth."

{¶ 122} The agency also presented evidence that Mother's therapist had referred Mother for more intensive therapy and mental-health services based on "clinical findings" of displaying delusions, grandiose delusions, schizoaffective paranoia and irrational thought and thinking and concerns regarding Mother's failure to "take accountability" for her actions. As of the time of the hearing, Mother was on a waiting list to receive more intensive therapy and services from Ohio Guidestone's Act Team.

{¶ 123} In determining that temporary custody was in the children's best interest, the record reflects that the juvenile court also considered the guardian ad litem's recommendation that temporary custody be granted to the agency and the children's wishes as expressed to the magistrate during the in camera interview. There is nothing in the record to support Mother's contention that the juvenile court impermissibly "disregarded" statements made by the children during the in camera interview when granting temporary custody to the agency.

{¶ 124} Mother also challenges the juvenile court's finding that reasonable efforts were made to eliminate the continued removal of the children from the home or make it possible for the children to return home. However, the record clearly supports the juvenile court's "reasonable efforts" finding. In general, "reasonable efforts" means "'[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed.'" *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28, quoting Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden Under*

*Federal Child Protection Legislation*, 12 B.U.Pub.Int.L.J. 259, 260 (2003). "'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.'" *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. In other words, the agency must use reasonable efforts to help remove the obstacles preventing family reunification. *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 76, citing Bean, *Reasonable Efforts: What State Courts Think*, 36 U.Tol.L.Rev. 321, 366 (2005).

{¶ 125} What constitutes "reasonable efforts" varies with the circumstances. *In re C.B.C.* at ¶ 76. "The issue in a reasonable-efforts determination is not whether the agency could have done more, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case." *In re A.F.*, 8th Dist. Cuyahoga No. 110503, 2021-Ohio-4519, ¶ 35. "Reasonable efforts" does not mean "'all available efforts.'" *In re J.B.*, 8th Dist. Cuyahoga No. 109039, 2020-Ohio-3675, ¶ 21, quoting *In re Lewis*, 4th Dist. Athens No. 03CA12, 2003-Ohio-5262, ¶ 16. In determining whether reasonable efforts were made, "the child's health and safety shall be paramount." R.C. 2151.419(A)(1).

{¶ 126} In this case, concerns regarding Mother's mental health, substance use, parenting skills and Mother's ability to provide a safe and appropriate environment for the children were the primary obstacles preventing Mother's reunification with the children. The record shows that CCDCFS made reasonable

efforts to reunite the family by implementing a case plan that included referrals for substantial services to address these concerns, including individual counseling for each of the children, family counseling and Protect Program services specifically designed to address the children's sexualized behaviors to keep the children safe from each other and around other children, as well as substance-abuse programming, mental-health services, parenting classes and a supportive visitation coach for Mother.

{¶ 127} Although Mother clearly loves her children, has a strong bond with them and has actively engaged in a number of services in an attempt to meet the objectives of her case plan, the evidence in the record strongly supports the juvenile court's conclusion that additional work remains to be done to resolve the concerns that led to the children being removed from the home before the children can be safely reunified with Mother.

{¶ 128} Accordingly, the juvenile court did not err or abuse its discretion in granting temporary custody of the children to the agency. We overrule Mother's third, fourth, fifth and ninth assignments of error.

### D. Ineffective Assistance of Counsel

{¶ 129} In her sixth assignment of error, Mother contends that she was denied the effective assistance of counsel.

{¶ 130} "The right to counsel, guaranteed in juvenile proceedings by R.C. 2151.352 and by Juv.R. 4, includes the right to the effective assistance of counsel." *In re I.R.*, 2021-Ohio-3103, 179 N.E.3d 138, ¶ 83 (8th Dist.). To establish ineffective

assistance of counsel, the represented party must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the party, i.e., a reasonable probability that but for counsel's errors, the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus; *In re I.R.* at ¶ 84. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694. Mother has not met her burden here.

{¶ 131} Three of the five attorneys Mother claims provided ineffective assistance — Zen Canady, Becky Blair and Denise Ferguson — did not represent Mother in the cases that are the subject of this appeal. With respect to the remaining attorneys, Attorney Amata (who represented Mother at the emergency custody hearing) and Attorney Palm (who represented Mother at the adjudicatory and dispositional hearings), Mother claims that Attorney Amata's performance was deficient because he "refused to even look at the evidence" and that Attorney Palm "withheld evidence * * * from the court," "lied to Mother" regarding Mother's ability to testify at the dispositional hearing and the existence of a possible "plea agreement" and failed to retain expert witnesses, file "requested discoveries" and make appropriate objections during the adjudicatory and dispositional hearings. The record does not support Mother's claims. There is nothing in the record to suggest that either attorney was not prepared for the hearings in this case. The

transcript from the hearings shows that both Attorney Amata and Attorney Palm effectively cross-examined the agency's witnesses, raised appropriate objections and zealously advocated on Mother's behalf. Further, even assuming there was some deficiency in her counsel's performance, Mother has not shown that she was prejudiced by any such alleged deficiency. As detailed above, substantial competent credible evidence was presented supporting the juvenile court's decision to grant temporary custody of the children to the agency.

{¶ 132} Mother's sixth assignment of error is overruled.

{¶ 133} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
LISA B. FORBES, J., CONCUR